# United States Court of Appeals
### For the Eighth Circuit

_____

No. 13-2621

_____

Mohammed Emu Ademo,

*Petitioner,*

v.

Loretta E. Lynch, Attorney General of the United States,

*Respondent.*

_____

No. 13-3566

_____

Mohammed Emu Ademo,

*Petitioner*,

v.

Loretta E. Lynch, Attorney General of the United States,[1]

*Respondent.*

_____

Petitions for Review of Orders of the
Board of Immigration Appeals

_____

___

[1]Loretta E. Lynch is automatically substituted for Eric H. Holder, Jr., pursuant to Federal Rule of Appellate Procedure 43(c)(2).

Submitted: October 8, 2014
Filed: July 30, 2015

_____

Before LOKEN, COLLOTON, and SHEPHERD, Circuit Judges.

_____

COLLOTON, Circuit Judge.

The petitioner, who identifies himself as Mohammed Emu Ademo, seeks review of a decision of the Board of Immigration Appeals denying his application for asylum, withholding of removal, and protection under the Convention Against Torture, and declining to address his request for voluntary departure. He also seeks review of a later order denying his motion to reopen proceedings. We conclude that the Board's decisions on asylum, withholding of removal, and the Convention Against Torture were supported by substantial evidence, and there was no abuse of discretion in denying the motion to reopen. We determine, however, that the Board erred by failing to address petitioner's appeal concerning voluntary departure, and we remand the case to the Board for the limited purpose of considering that point.

I.

Petitioner traveled from Ethiopia, and entered the United States in December 2002. He carried a valid Ethiopian passport and non-immigrant visitor's visa issued under the name Dame Haji Hiko. Shortly thereafter, he sought asylum. Petitioner asserted that the Ethiopian government persecuted him on account of his political opinion, and that he had a well-founded fear of persecution if he were returned. Petitioner claimed that he was detained and beaten on two separate occasions because of his membership in the Oromo ethnic group and in retaliation for his support of an organization called the Oromo Liberation Front.

There is a lengthy procedural history to this case, and it is necessary to explain the course of proceedings in some detail before addressing the petitions for review. At a hearing in 2005, petitioner testified that he was arrested and detained for six months in 2001 after a protest at his school. He said that guards beat him frequently with a rubber hose and deprived him of food, and that he feared for his life. In a point that became central to his credibility, petitioner also testified that in the midst of this detention and series of beatings, authorities allowed him to leave the prison for two days to take the Ethiopian School Leaving Certificate Exam, so that he could graduate from school. Petitioner also claimed that in 2002, he was arrested, detained, and beaten again while attending Addis Ababa Commercial College. Several months later, he explained, a college official told him that he and other students were creating problems with their activities, and that he should report to the police. Rather than engage with the police, petitioner left Ethiopia.

In June 2006, an immigration judge granted Ademo's application for asylum. The judge found it "plausible" that petitioner was really Mohammed Emu Ademo, even though he applied for a visa and used a passport under the name of Dame Haji Hiko, because petitioner admitted that he traveled under a false name, and "[i]t is not particularly uncommon for individuals who are fleeing their country to use false documents to exit the country." The IJ expressed concern about petitioner's testimony that he was allowed to leave jail to take a school finishing exam during a period of alleged persecution, stating that it "seem[ed] to be remarkable cooperation on the part of detaining authorities" and "somewhat difficult to believe." But "considering the evidence as a whole, and the general consistency of [petitioner's] testimony," the IJ found him "generally credible."

The immigration judge then found that petitioner was a victim of past persecution in Ethiopia. The judge cited petitioner's testimony that he was subjected to two detentions and periods of abuse, including one that lasted six months, and evidence of scars that petitioner displayed for the court. The IJ relied on "background

-3-

documents on Ethiopia" reflecting "that there have been widespread arrests of students," and corroborating evidence from sources who confirmed petitioner's leadership role in student organizations. The finding of past persecution created a presumption that petitioner has a well-founded fear of persecution upon return to Ethiopia, *see* 8 C.F.R. § 1208.13(b)(1), and the IJ found no evidence of a significant change in circumstances in the country. Accordingly, the IJ granted petitioner's application for asylum.

In July 2006, however, the Department of Homeland Security moved to reopen the case based on newly discovered evidence relating to petitioner's identity that was belatedly forwarded by the State Department. The Department of Homeland Security cited petitioner's non-immigrant visa application, which was completed by petitioner in 2002 under the name Dame Haji Hiko. The application included a referral form signed by the Regional Security Officer of the United States Embassy in Ethiopia. The form identified Dame Haji Hiko as the brother of Ato Tahir Hajji, head of VIP Security for the Ethiopian Security, Immigration, and Refugees Affairs Authority. The American embassy's security officer urged that "[h]elping Ato Tahir's brother will promote the Embassy's & the U.S. interest as a whole." The Department argued that the new evidence "clearly contradicts the facts as stated by the [petitioner] during his asylum hearing, and tends to suggest that his asylum application was fraudulent."

The IJ granted the Department's motion to reopen, observing that the new evidence "raises serious challenges about [petitioner's] claims about his identity and the validity of his asylum claim." The IJ recalled that he had wanted to see the visa application before making the initial decision, and said that the government would be allowed to present the information at a reopened hearing.

After a new hearing, the immigration judge reversed his earlier conclusion and denied petitioner's application for asylum. The IJ explained that his first decision had granted petitioner the benefit of the doubt by overlooking petitioner's "extremely

implausible" claim that his persecutors released him from prison for two days during a six-month incarceration to take the school finishing exam. The judge concluded that the visa application presented another "even more serious concern" about petitioner's identity and credibility.

Petitioner testified that he just made up the names "Haji Hiko" to go along with a nickname, "Dame," in the visa application. But the immigration judge focused on the referral form from the American embassy official identifying petitioner as the brother of an Ethiopian government official named Ato Tahir Hajji. The IJ found it "hard to believe that the Embassy, specifically the regional security official for the Embassy, would fabricate the identity of a high security official in Ethiopia." The judge concluded that petitioner's inability to explain the referral form "severely undercuts the credibility of his story" that he was "arrested and held for substantial periods of time in Ethiopia." In other words, the referral form suggested that petitioner was really the brother of an Ethiopian security official named Hajji, not a student named Ademo fleeing persecution by the Ethiopian government.

The IJ concluded that the visa application and the implausible claim that he was released from prison for a two-day school exam were "grievous flaws" in petitioner's case. Explaining that the case turned on credibility, the judge observed that petitioner presented no documentary evidence establishing that he had been arrested and detained in Ethiopia. The judge believed that statements from individuals in the United States about petitioner's activities were insufficient to establish his credibility. Because petitioner failed to establish his credibility, the IJ denied asylum, withholding of removal, and relief under the Convention Against Torture.

Petitioner appealed to the Board. While the appeal was pending, petitioner obtained an Ethiopian passport in the name of Mohammed Emu Ademo. He then moved to remand the case to the immigration judge, arguing that the new passport

proved his true identity. The Board granted the motion to remand "so that the Immigration Judge may consider the reliability of [the new] evidence, and enter such findings, as may be appropriate for adjudication of the claim."

On remand, before a different immigration judge, petitioner presented the new passport as evidence of his identity. In an effort to address the first immigration judge's concern about the school exam, petitioner submitted an affidavit from Birhanemeskel Abebe Segni, a former Ethiopian diplomat living in Minnesota. Segni explained the importance of the school finishing exam for Ethiopian students, and averred that "as a matter of practice, Ethiopian prisons do allow prisoners to take" the exam. Segni said that he personally observed prisoners taking the exam in 1992 and 1993 when he worked as an exam station monitor.

The new evidence was considered at a hearing in May 2010. The Department also raised a new obstacle to relief. The Department suggested for the first time that petitioner—due to his participation in the Oromo Liberation Front—was ineligible for asylum based on the so-called terrorism bar of 8 U.S.C. § 1182(a)(3)(B)(i). Petitioner testified in 2005 that he participated in the Oromo Liberation Front from the United States by making donations, giving them money, and reading poems at meetings. The government pointed to evidence in the record that the Oromo Liberation Front was involved in terrorist activities. At the 2010 hearing, petitioner testified about his support for the ideals of the organization but denied advocating violence to overthrow the government.

In March 2011, the immigration judge denied petitioner's application and ordered his removal to Ethiopia. In her decision, the IJ reaffirmed the previous decision that petitioner was not credible. The judge found it implausible that the Ethiopian authorities detained petitioner, beat him, and starved him, but then took him out of prison to the school exam so that he could obtain a degree. The IJ was not convinced otherwise by Segni's affidavit. The IJ noted that Segni's observations

occurred many years before the incident in question. The judge found that Segni's affidavit did not explain what type of prisoners he saw taking the exam and did not establish that release of prisoners for the exam was a common occurrence.

The IJ also was not convinced that the new passport credibly established petitioner's identity as Mohammed Emu Ademo. The judge observed that petitioner now had presented two legitimate Ethiopian passports—one as Ademo and one as Dame Haji Hiko. The new Ademo passport, the IJ concluded, "confuses the issues surrounding his identity even further." The IJ gave "little weight" to letters from members of the Oromo community about petitioner's identity, citing inconsistent use of names and unexplained bases of knowledge, and noted that petitioner's mother and wife did not write or send documentation of his identity.

Having found that petitioner was not credible, the IJ denied his claim for asylum, withholding of removal, and relief under the Convention Against Torture. The IJ concluded alternatively that petitioner was ineligible for relief because he provided material support to a Tier III terrorist organization by soliciting funds for the Oromo Liberation Front. The IJ summarily denied petitioner's application for voluntary departure.

On administrative appeal, the Board in June 2013 upheld the denial of relief. The Board concluded that the IJ's adverse credibility finding was not clearly erroneous in light of confusion over petitioner's identity and the inherent implausibility of petitioner's claim that his persecutors released him from prison for a two-day school exam. The Board also noted that petitioner failed to submit corroborating affidavits about identity from his wife and mother, despite maintaining contact with them.

Because petitioner was not credible, the Board upheld the denial of asylum and withholding of removal. Alternatively, the Board determined that even if petitioner

were deemed credible, he would be ineligible for asylum and withholding of removal because he provided material support to a terrorist organization by donating money. *See* 8 U.S.C. § 1182(a)(3)(B)(i). The Board also rejected petitioner's claim under the Convention Against Torture, finding that he "failed to credibly establish that it is more likely than not that he will be tortured by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity upon removal to Ethiopia, for any reason, even considering country conditions." R. 5 (internal quotation omitted). The decision did not address the question of voluntary departure.

Petitioner persisted in the administrative process, filing a motion to reopen with the Board. He submitted declarations and affidavits from family members and friends concerning his identity, his work as an activist for the Oromo community, and his alleged persecution at the hands of the Ethiopian government. The materials also addressed petitioner's recent activism and work as a journalist in the United States. The Board denied the motion to reopen, concluding that the proffered affidavits were not previously unavailable, *see* 8 C.F.R. § 1003.2(c)(1), and would not have changed the result in any event. The Board determined that the remaining proffered documentation would not materially alter its previous findings, and further observed that petitioner did not address the Board's alternative denial of relief based on the terrorism bar.

Petitioner timely sought review of both the Board's final decision in June 2013 and the denial of the motion to reopen. This court consolidated the two appeals.

II.

A.

We first address the Board's decision of June 2013 upholding the denial of relief from removal. We consider issues of law de novo; we review the Board's findings of fact, and any findings of the immigration judge adopted by the Board, under the deferential "substantial evidence" standard. *Martinez-Galarza v. Holder*, 782 F.3d 990, 993 (8th Cir. 2015). The IJ's credibility finding, affirmed by the Board, must be accepted "unless any reasonable adjudicator would be compelled to conclude to the contrary" after reviewing the record as a whole. 8 U.S.C. § 1252(b)(4)(B); *INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992); *Singh v. Gonzales*, 495 F.3d 553, 556 (8th Cir. 2007).[2]

Petitioner disputes the finding that he failed to prove his identity with credible evidence. The crux of the agency's determination was that petitioner could not explain the referral form attached to his visa application. That concern strikes us as quite reasonable. A security officer at the American Embassy wrote that petitioner, who applied as Dame Haji Hiko, was the brother of an Ethiopian security official named Ato Tahir Hajji, and that it was in the interests of the United States to assist petitioner. If petitioner is really Mohammed Emu Ademo, and merely created a fictitious name of Dame Haji Hiko to escape persecution in Ethiopia, then why would an American official recommend helping petitioner because he is the brother of Ato Hajji? The IJ and the Board understandably reasoned that petitioner may well be Dame Haji Hiko, and that the story of Mohammed Emu Ademo could be untrue.

---

[2]Petitioner filed his first application before enactment of the Real ID Act of 2005, so the more specific provisions of that Act concerning credibility determinations, 8 U.S.C. § 1158(b)(1)(B)(iii), do not apply. *See Singh*, 495 F.3d at 556 n.1.

Petitioner says the Board gave too much weight to the referral form, because he cannot be expected to explain a document prepared by a third party. Absent an explanation from petitioner, however, the Board reasonably inferred that an American official was unlikely to create a fictitious Ethiopian security official on his own initiative in order to assist petitioner with his visa application. The more natural inference is that petitioner or an Ethiopian security official procured the referral.

Petitioner cites other evidence that he says shows convincingly that he is really Mohammed Emu Ademo. He points to a School Leaving Certificate bearing his picture and issued to a person named Ademo by the Ethiopian Ministry of Education in 2001. He relies on the passport issued to him as Ademo by the Ethiopian government in 2008. He cites two letters from persons who say that they knew Mohammed Emu Ademo in Ethiopia. Petitioner also lists a school yearbook from 2001 that pictures him as "Muhaammad Immuu"—a name that petitioner says reflects the spelling of Mohammed Emu in the Oromo language. And he notes that the visa application in the name of Dame Haji Hiko was signed "MEAB," which petitioner says are the initials of his real name ("Mohammed Emu Ademo," with "B" standing for his great-great-grandfather's last name, Bashiro).

The Board discounted most of this evidence. The Board acknowledged the school record bearing his picture and the Ademo name, but said that other school records spelled his name inconsistently: a school transcript lists his name as "Muhammed Emu Adem." The Board acknowledged receipt of numerous letters supporting the application, but focused on one letter that identified petitioner as both "Mohammed" and "Dame," thus "creating further confusion" about petitioner's identity. The Board thought the yearbook was "peculiar" evidence, because petitioner was not pictured in cap and gown like the other students.

Petitioner offers explanations for all of this. The difference on the school documents between "Muhammed" and "Mohammed" and between "Ademo" and

"Adem," he says, are minor errors that should not be given weight. He claims to have used the nickname "Dame," so the letter writer's use of both "Mohammed" and "Dame" should not be confusing. The yearbook was created after he was forced to flee the country before his school year ended, he avers, but he submitted a photograph later, and his classmates agreed to include it with the others taken in cap and gown.

As we see it, the IJ and the Board did not ignore this evidence and these explanations; they were just not convinced. The question for us is whether a reasonable adjudicator was compelled to reach a conclusion in petitioner's favor. Under that standard, the principal sticking point is the referral form submitted with the visa application. Despite petitioner's evidence that he is really "Ademo," a reasonable adjudicator could remain skeptical in light of the American security official's representation that petitioner was the brother of Ato Tahir Hajji. Petitioner hypothesizes that the American official might simply have "exploited a coincidental similarity" between Ato Tahir Hajji's name and petitioner's "alias" in an effort to assist petitioner, but the Board reasonably could dismiss that suggestion as far-fetched. Not surprisingly, the Board noted that petitioner failed to present evidence from his wife and mother that might have cleared up whether there is a familial relationship between petitioner and a security official named Ato Hajji. Given that petitioner elected to use the name Dame Haji Hiko on his visa application, it was permissible for the Board to require petitioner to produce more convincing evidence to refute the referral form and to explain his true identity.

The IJ and the Board, moreover, cited petitioner's inherently implausible story about release from prison to take the school exam as a second reason why they doubted his credibility. The adjudicators did not believe that Ethiopian authorities who allegedly persecuted petitioner during a six-month detention by starving him and beating him regularly with a rubber hose would release him from prison for a two-day examination so that he could graduate from school. An immigration judge may base an adverse credibility finding on the implausibility of an alien's testimony, *Mamana*

-11-

*v. Gonzales*, 436 F.3d 966, 968-69 (8th Cir. 2006), and a reasonable adjudicator could do so here.  Petitioner contends that the affidavit of former diplomat Segni shows that his account is plausible.  But the Board reasonably determined that Segni did not address the same time period or establish that authorities were likely to accommodate prisoners who were held and persecuted on account of their political opinion.

The Board's decision to affirm the adverse credibility finding of the immigration judge is supported by substantial evidence, and it was a sufficient basis to deny asylum and withholding of removal.  It is thus unnecessary to address whether the terrorism bar provides an independent basis to deny relief.

Petitioner complains that the immigration judge failed to analyze separately his claim for protection under the Convention Against Torture.  He contends that he has engaged in journalism and advocacy for the Oromo people while in the United States, and that the Ethiopian government employs torture to suppress such advocacy and independent reporting.  He cites an Amnesty International report from 2009 stating that the Ethiopian government "detained thousands of individuals suspected of supporting the Oromo Liberation Front," and that "many have been tortured or otherwise ill-treated."  He also relies on a report of Advocates for Human Rights that describes "the extensive use of torture against the Oromo in Ethiopia."

Whatever the shortcomings of the immigration judge's analysis, the Board did analyze the Convention Against Torture separately.  The Board found based on the record as a whole—including country conditions—that petitioner did not credibly establish that it is more likely than not that he would suffer torture.  *See* 8 C.F.R. § 208.16(c)(2).  The Board cited precedents holding that a "chain of assumptions and a fear of what might happen" do not meet the burden of demonstrating a clear possibility of torture, *see Matter of M-B-A-*, 23 I&N Dec. 474, 479-80 (B.I.A. 2002), and that a petitioner must establish "that each link in the hypothetical chain of events

leading to the claim of likely torture" is more likely than not to occur. *See Matter of J-F-F-*, 23 I&N Dec. 912, 917-18 & 918 n.4 (A.G. 2006).

A reasonable adjudicator could have found the evidence insufficient to establish a likelihood of torture. Without a finding that he is credible, petitioner lacks evidence that he was persecuted or tortured while in Ethiopia. Information from country reports that the Ethiopian government uses torture against the Oromo Liberation Front in some instances, together with evidence of petitioner's activity in the United States, does not compel a conclusion that the Ethiopian government more likely than not would torture this particular individual if he were returned. The Board, citing the United Nations Committee Against Torture, has concluded that "the existence of a consistent pattern of gross, flagrant, or mass violations of human rights in a particular country does not, as such, constitute a sufficient ground for determining that a particular person would be in danger of being subjected to torture upon his or her return to that country. Specific grounds must exist that indicate the individual would be personally at risk." *See In re S-V-*, 22 I&N Dec. 1306, 1313 (BIA 2000) (citation omitted). We see no error in that interpretation of the Convention and the implementing regulations. *Accord Valdiviezo-Galdamez v. Attorney Gen. of the U.S.*, 663 F.3d 582, 592 (3d Cir. 2011). The Board reasonably required more specific evidence in this case before concluding that relief under the Convention is warranted.

B.

The second petition for review concerns the Board's denial of petitioner's motion to reopen, which we review for abuse of discretion. *INS v. Doherty*, 502 U.S. 314, 323 (1992). A motion to reopen must present new evidence that is "material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1). Petitioner submitted declarations from family members attesting to his identity, affidavits from two fellow students from Addis

Ababa Commercial College about petitioner's alleged political activity, evidence related to his work as a journalist in the United States, and updated reports on country conditions in Ethiopia.

The Board concluded that petitioner failed to show that the affidavits from family members were previously unavailable, observing that petitioner had opportunities to present such evidence in 2008 and 2010. The Board also determined that the documents would not likely change the result, because petitioner had not sufficiently addressed the issues about his identity and credibility, and because the materials appeared "to be prepared for litigation by interested witnesses not subject to cross-examination." The Board further concluded that the "remaining proffered documentation," which included information concerning petitioner's work as a journalist in the United States and the treatment of journalists in Ethiopia, would not alter the findings in the Board's June 2013 decision. On the application for asylum and withholding of removal, we see no abuse of discretion in the Board's conclusion that the proffered materials either were not previously unavailable or would not change the previous findings about identity and credibility.

Pressing his claim under the Convention Against Torture, petitioner points to a letter dated August 2013 from the Committee to Protect Journalists predicting that petitioner "would face incarceration and even torture if he were to return home." The letter, however, recounts only that eleven journalists "have been sentenced to harsh prison terms" under a 2009 anti-terrorism law, and that "[t]he government has declined to investigate allegations of torture of detainees." The letter does not provide evidence that journalists have been tortured. A human rights report from the State Department does say that a newspaper editor and columnist were arrested in July 2012, and that the columnist "reportedly was tortured." But we are not prepared to say that the record compels a conclusion that any independent journalist who covers sympathetically the plight of the Oromo people is "more likely than not" to be tortured. Given the lack of evidence deemed credible that petitioner was targeted by

-14-

authorities while in Ethiopia, and the absence of more specific evidence to show a likelihood that this particular alien would be tortured if returned, we cannot say that the Board's conclusion was an abuse of discretion.

## III.

Petitioner contends that if he is ordered removed, then the Board erred by failing to address his argument that the immigration judge should have granted him the privilege of voluntary departure. *See* 8 U.S.C. § 1229c. Petitioner argued before the Board that the immigration judge incorrectly denied his application for voluntary departure without analysis, but the Board did not address the issue and did not adopt the decision of the immigration judge. Petitioner raised the voluntary departure issue in his appeal to this court, and the government did not respond to the argument. Although we lack jurisdiction "over an appeal from denial of a request for an order of voluntary departure," 8 U.S.C. § 1229c(f), the Board in this case did not deny a request or adopt a denial made by the immigration judge. The Board simply did not rule. While we would not have jurisdiction to review an exercise of discretion by the Board on voluntary departure, we do have jurisdiction to review the Board's failure to exercise its discretion at all. *Cf. Kirong v. Mukasey*, 529 F.3d 800, 806 (8th Cir. 2008).

We therefore grant the first petition on this point only. We remand the case to the Board for the limited purpose of addressing petitioner's appeal from the immigration judge's decision denying summarily his application for voluntary departure.

\* \* \*

For the foregoing reasons, the petition for review in No. 13-3621 is granted insofar as the Board must address petitioner's administrative appeal concerning

-15-

voluntary departure.  The petition in No. 13-2621 is denied in all other respects.  The petition for review in No. 13-3566 is also denied.

_____