United States Court of Appeals
For the Eighth Circuit
_____

No. 20-2964
_____

Victor Hugo Paredes Gonzales; Pablo Paredes Gonzales; Jose Paredes Gonzales

*Petitioners*

v.

Merrick B. Garland, Attorney General of the United States

*Respondent*
_____

Petition for Review of an Order of the
Board of Immigration Appeals
_____

Submitted: October 19, 2021
Filed: April 1, 2022
_____

Before COLLOTON, SHEPHERD, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

Victor Hugo Paredes Gonzales, Pablo Paredes Gonzales, and Jose Paredes Gonzales (collectively, Petitioners),[1] sought asylum, withholding of removal, and protection under the Convention Against Torture (CAT). An immigration judge (IJ) denied Petitioners all relief, and the Board of Immigration Appeals (BIA or Board)

_____

[1]When referring to individuals, we use first names for clarity.

affirmed. Petitioners seek review of the denial of their CAT claim. Having jurisdiction under 8 U.S.C. § 1252, we deny the petition.

I.

Petitioners are brothers and citizens of Bolivia. They, along with a fourth partner named Luis Fernando Galleguillos Larrain, operated a company producing organic stevia called Tierra Dulce. Petitioners came to the United States on temporary visas in May 2015. They assert that they fled Bolivia because investors in Tierra Dulce, many of whom were retired Bolivian military and government officials, were unhappy with the lack of returns in 2014 and 2015 and threatened Petitioners with harm. Petitioners were charged with fraud in Bolivia and warrants were issued for their arrest in May 2015. Luis also fled Bolivia initially but returned in June 2015. He was jailed and has not received a trial on the charges against him. Bolivia subsequently obtained Interpol Red Notices seeking Petitioners' arrest.[2]

Once their temporary visas expired, Petitioners sought asylum in the United States, and their I-589 applications were referred to the immigration court. In 2019, Petitioners were charged with removability and conceded the charges. They filed updated I-589 forms, and the IJ held hearings on their petitions in January 2020. The IJ denied Petitioners' claims for asylum, withholding of removal, and CAT protection. In particular, the IJ was not satisfied that Petitioners' testimony was credible because of inconsistencies and gaps in the record. The IJ also found that Petitioners had not shown it was more likely than not they would be tortured if returned to Bolivia. Petitioners appealed to the BIA, which affirmed the IJ's opinion. The BIA concluded that the IJ did not clearly err in making an adverse credibility finding or concluding that Petitioners had not demonstrated with sufficient certainty

---

[2]Interpol describes a Red Notice as "a request to law enforcement worldwide to locate and provisionally arrest a person" so he or she can be returned to the country where an alleged crime was committed for judicial proceedings. Red Notices, Interpol, https://www.interpol.int/en/How-we-work/Notices/Red-Notices (last visited Mar. 28, 2022).

that they would be tortured. Petitioners had also filed a motion to remand on the basis of new evidence—a document indicating that the district attorney in Bolivia recommended dismissal of some of the charges against Petitioners. The BIA denied the motion, finding that the dismissal was not relevant to the dispositive issues of Petitioners' claims for relief before the IJ.

Petitioners seek review, but only of the decision to deny them CAT relief. First, Petitioners argue that the BIA abused its discretion in making an adverse credibility finding against them. Second, Petitioners argue that the BIA applied the wrong legal standard in determining that they failed to show they would be subject to torture if returned to Bolivia. Additionally, while their petition was pending before this court, Petitioners asked Interpol to delete the Red Notices issued for Victor and Jose.[3] In July 2021, Interpol granted the request. Petitioners then filed a motion asking this court to remand their petition for reconsideration in light of this development, or in the alternative, to hold the matter in abeyance pending a decision on Petitioners' motion to reopen proceedings before the BIA.

II.

As an initial matter, we take up Petitioners' motion to remand or to hold the case in abeyance. In support of their motion, Petitioners characterize Interpol as finding "irreconcilable fault with the veracity of the R[ed] Notices." And because the IJ gave "significant weight" to the now-rescinded Notices and to the Bolivian indictment generally, Petitioners say the IJ must be given an opportunity to reconsider her decision.

Petitioners' motion for remand mischaracterizes both Interpol's decision and the impact of the Red Notices on the IJ's rulings. Petitioners assert that Interpol's action constitutes "a wholescale [sic], post decision, impeachment of the evidentiary

---

[3]There was no longer a Red Notice for Pablo because he had already returned to Bolivia.

basis for [the BIA's] decision" and argue that Interpol "has outright repudiated reliance on the very evidence that the Service touted before the [IJ]" and "unequivocally impeached a key piece of evidence."

Petitioners sought deletion of the Red Notices because the case was "of a predominantly political character." Reviewing the information provided, Interpol declined to find the case was predominantly political. However, Interpol did conclude that the Red Notices were not supported by "sufficient judicial data" as required by Interpol rules for a valid notice to issue. Interpol found the Red Notices failed to comply with Interpol rules applicable to cases involving multiple individuals. In particular, it found "the study of the summary of facts of [each] Red Notice . . . raises questions as to the role that was allegedly played by the Applicant himself in the facts of which he is accused." In other words, the Red Notices did not meet Interpol standards because the case involved several individuals but the information provided by the Bolivian government did not describe the specific role played by either Victor or Jose in the crime alleged.

Furthermore, Interpol explicitly stated that "the Commission is not empowered to conduct an investigation, weigh evidence, or make a determination on the merits of the case" and that its analysis was limited to whether each file met Interpol's requirements for accuracy and relevancy. Thus, Interpol's decision to delete the Red Notices cannot be construed as offering an opinion on the merits of the criminal proceedings against Petitioners. Rather, the Red Notices were deleted because materials provided by the Bolivian government did not meet Interpol's sufficiency requirements.

Second, we disagree with Petitioners' claim that the existence of the Red Notices was a material factor in the IJ's decision on their CAT claim. It is true the IJ noted that the Red Notices could be treated as "reliable [evidence of] a request by a member country to provisionally arrest a specifically identified person pending extradition based on a valid national arrest warrant for a crime that is not political in nature." However, this was not a factor in the IJ's adverse credibility finding.

Rather, that finding was "[b]ased on the discrepancies" in the record and with Petitioners' 2016 petitions for asylum. The IJ's discussion of credibility includes the pending lawsuit in Bolivia but does not mention the Red Notices.

Even if the Red Notices gave an additional imprimatur of legitimacy to the Bolivian proceedings, the BIA already held this factor was not material to Petitioners' claims. Petitioners asked the BIA to remand in light of evidence that the prosecuting attorney in Bolivia recommended dismissing some of the criminal charges. The BIA denied the motion to remand, stating that "the submission is not material" because it would not affect the IJ's credibility determination or, if it would, the submission "is not material as it does not link the potential harm to a protected ground, and does not establish a likelihood of torture," which are the "dispositive issues."

Deletion of the Red Notices is likewise immaterial here. Even if we assume that the Red Notices contributed to the IJ's adverse credibility finding, the deletion of the Notices is not material to the dispositive issues on review, which turn on the likelihood of enduring torture upon removal to Bolivia. Bolivia's decision to request Red Notices without adhering to the applicable Interpol rules does not make it any more likely that Petitioners will be subject to torture if returned to Bolivia. As such, we deny the motion to remand or hold the case in abeyance.

III.

We now turn to the merits of the petition for review. "We review the Board's decision as the final agency action, including the IJ's findings and reasoning to the extent that the Board expressly adopted them." Mumad v. Garland, 11 F.4th 834, 837 (8th Cir. 2021). Here, the BIA expressly adopted the IJ's decision, so we "also review the IJ's decision as part of the final agency action." Galloso v. Barr, 954 F.3d 1189, 1191 (8th Cir. 2020) (quoting Davila-Mejia v. Mukasey, 531 F.3d 624, 627 (8th Cir. 2008)). "We review the BIA's legal determinations de novo and employ the deferential 'substantial evidence' standard when reviewing the BIA's

factual determinations." Id. (quoting Eusebio v. Ashcroft, 361 F.3d 1088, 1091 (8th Cir. 2004)). "Accordingly, we will affirm the BIA's factual findings 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" Rosales-Reyes v. Garland, 7 F.4th 755, 759 (8th Cir. 2021) (quoting Etchu-Njang v. Gonzales, 403 F.3d 577, 580 (8th Cir. 2005)).

A.

First, Petitioners challenge the IJ's adverse credibility finding, as adopted and affirmed by the Board. A petitioner "faces a high hurdle to overcome an adverse credibility determination by the IJ. Such determinations are afforded great deference. We review for substantial evidence, and it is a rare case where an adverse credibility determination is disturbed on appeal." Tian v. Barr, 932 F.3d 664, 668 (8th Cir. 2019) (citation omitted). "Under our standard of review, credibility findings must be 'supported by specific, cogent reasons for disbelief.'" Id. (quoting Sivakaran v. Ashcroft, 368 F.3d 1028, 1028 (8th Cir. 2004)). "'[I]t cannot rely on trivial details or easily explained discrepancies.'" Id. (quoting Tandia v. Gonzales, 487 F.3d 1048, 1052 (7th Cir. 2007)). Rather, the IJ "must provide reasons that are specific enough for a reviewing court to understand the rationale behind the decision and convincing enough that a reasonable adjudicator would not be compelled to reach a contrary result." Nadeem v. Holder, 599 F.3d 869, 872 (8th Cir. 2010). "The IJ is in the best position to make credibility findings because she sees the witness as the testimony is given." Ali v. Holder, 776 F.3d 522, 526 (8th Cir. 2015) (cleaned up) (quoting Fesehaye v. Holder, 607 F.3d 523, 527 (8th Cir. 2010)).

Petitioners specifically attack three facets of the adverse credibility finding: (1) the IJ's failure to acknowledge the evidence in the record that the Interpol Red Notices were politically motivated; (2) the IJ's reliance on minor inconsistencies between the Petitioners' testimony and their earlier asylum applications; and (3) the IJ's failure to consider Petitioners' explanation for their inability to provide adequate business records. Petitioners also argue that the IJ failed to offer clear and logical reasons for discrediting their testimony.

-6-

As to Petitioners' first argument, we have already discussed why the Interpol Red Notices—and their subsequent deletion—are not material to the IJ's adverse credibility finding. Second, the IJ's opinion does mention minor inconsistencies that, by themselves, might not have been sufficient to justify an adverse credibility finding. But the IJ also highlights significant discrepancies between Petitioners' affidavits in their 2016 applications for asylum and their more recent 2020 testimony regarding the nature of the harm they suffered before fleeing Bolivia and the identity of the perpetrators. In particular, the IJ noted that none of Petitioners' 2016 affidavits mentioned physical attacks on Victor, but in his 2020 testimony, Victor claimed to have been attacked three times before they left Bolivia. He even identified the military officers who attacked him by name. In the IJ's estimation, Victor's explanation that he withheld this information from his 2016 affidavit due to fear of repercussions against his family in Bolivia if he "opened his mouth" was unpersuasive in light of the fact that he alleged in that same affidavit threats to kidnap and kill him and his family.

Also, all three brothers named one specific person in their 2016 affidavits as the ringleader of their persecution, but they could offer little information about him in their 2020 testimony. Moreover, at the 2020 hearing, the brothers identified a different person as the ringleader and recounted incidents involving him that occurred before the 2016 affidavits were filed. Given the timing, the IJ found it implausible that Petitioners only recently became aware of this newly identified ringleader's involvement in their persecution.

Similarly, while a lack of business records to corroborate Petitioners' testimony may not be sufficient by itself for an adverse credibility finding—after all, Petitioners fled Bolivia to escape persecution—it was significant in context because Petitioners seemed to have limited knowledge of their business. They offered inconsistent and sometimes vague testimony about the size of the business, the specifics of its operation, the number and nature of their investors, and the profit investors could expect. The IJ found it reasonable to expect Petitioners would have access to at least some of their business records, given the alleged size of the

operation and the years they had to gather relevant materials from lawyers and third parties. In the end, the IJ found Petitioners' testimony was not credible, and they offered no records to convince her otherwise.

We give deference to the IJ's detailed credibility assessment and, after reviewing the extensive record, we are persuaded that there is substantial evidence to support it. See Coto-Albarenga v. Garland, 4 F.4th 628, 632 (8th Cir. 2021).

B.

Petitioners also argue that the IJ applied the wrong legal standard in assessing the likelihood that they would be tortured upon return to Bolivia. To qualify for relief under CAT, a noncitizen must show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." Malonga v. Mukasey, 546 F.3d 546, 554–55 (8th Cir. 2008) (quoting 8 C.F.R. § 1208.16(c)(2)). "[T]he first element of a CAT claim, the likelihood determination, is a factual inquiry." Lasu v. Barr, 970 F.3d 960, 966 (8th Cir. 2020). We therefore apply the substantial evidence standard. See Ademo v. Lynch, 795 F.3d 823, 831 (8th Cir. 2015) (reviewing likelihood-of-torture determination for substantial evidence). This court has held that "a pattern of human rights violations in a country is insufficient to justify relief under the CAT: 'Specific grounds must exist that indicate the individual would be personally at risk.'" Abdi Omar v. Barr, 962 F.3d 1061, 1065 (8th Cir. 2020) (quoting Ademo, 795 F.3d at 831).

In assessing whether it is more likely than not that an applicant will be tortured, the IJ is directed to consider:

(i) Evidence of past torture inflicted upon the applicant;
(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

-8-

(iv) Other relevant information regarding conditions in the country of removal.

8 C.F.R. § 208.16(c)(3). The applicable regulations define "torture" as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity.

Id. § 208.18(a)(1). The regulations further specify that torture "is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment," id. § 208.18(a)(2), and that torture "does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions," id. § 208.18(a)(3). Additionally, the regulations require that an act "must be specifically intended to inflict severe physical or mental pain or suffering" in order to constitute torture. Id. § 208.18(a)(5).

Here, Petitioners identify the certainty of their pretrial detention in Bolivia as the torture they will suffer. Petitioners argue that the BIA and the IJ committed legal error by failing to consider whether indefinite detention, in combination with the conditions of that detention, is a "lawful sanction" and whether it would be "specifically intended" to torture Petitioners. Petitioners also assert that the IJ erred in concluding that the perpetrators of the harm would be acting in their individual capacities and not under color of law.

The IJ acknowledged the evidence Petitioners put forward: testimony that Victor had been physically attacked more than once in Bolivia and Petitioners' family had been harassed; allegations that Luis, Petitioners' business partner, was tortured while incarcerated; and State Department reports of torture by police and abysmal prison conditions. The IJ concluded that the abuse committed against

Victor before he left Bolivia did not rise to the level of torture and that those who attacked him did so in their individual capacities. As to Luis, the IJ did not give the testimony regarding his treatment much weight. Jose testified, "We learned through my mother's attorney that [Luis] was jailed, that he was tortured in jail, raped, and the last thing I heard is that he tried to commit suicide again." But Petitioners' mother and her attorney both submitted letters to the IJ describing events in Bolivia that were relevant to Petitioners' claim, and neither of them mentioned anything about the conditions of Luis's detention.

The only other evidence in support of Petitioners' claim is the State Department's 2018 Human Rights Report on Bolivia, which discusses the use of torture by police and in the prison system. It notes that prisons in Bolivia are "overcrowded, underfunded, and in poor physical condition, resulting in harsh and life-threatening conditions" and that "[v]iolence was pervasive due to inadequate internal security." As the IJ pointed out, however, "abusive or squalid conditions in pretrial detention facilities or prisons that result from a lack of resources rather than a specific intent to cause severe pain or suffering do not establish a sufficient likelihood of torture" for purposes of CAT. (citing Matter of J-R-G-P-, 27 I. & N. Dec. 482 (B.I.A. 2018)). It is not enough to allege that prison conditions constitute torture when they are the result of neglect and underfunding rather than intentional and targeted. See Cherichel v. Holder, 591 F.3d 1002, 1017 (8th Cir. 2010), abrogated on other grounds by Nasrallah v. Barr, 140 S. Ct. 1683 (2020).

Petitioners presented no evidence to show that their business partner was specifically targeted for torture while in custody or that they would be as well. The IJ's conclusion that Petitioners failed to establish it is more likely than not they would be tortured in a Bolivian prison is supported by substantial evidence. With that finding, it was unnecessary for the IJ to reach any of Petitioners' other arguments.

For these reasons, we deny the petition.

_____