# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-2140

_____

Ararso Umare Mumad

*Petitioner*

v.

Merrick B. Garland,[1] Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: April 15, 2021
Filed: August 27, 2021

_____

Before KELLY, GRASZ, and KOBES, Circuit Judges.

_____

GRASZ, Circuit Judge.

Ararso Umare Mumad asks us to stop his deportation to Ethiopia—where he fears ethnically and politically-motivated violence. To do so, he asks us to declare part of the Immigration and Nationality Act unconstitutional. While Congress bars

_____

[1]Respondent Garland was automatically substituted for his predecessor under Fed. R. App. P. 43(c)(2).

the Department of Homeland Security from returning Mumad to Ethiopia if the Attorney General decides that doing so would threaten Mumad's freedom or life (8 U.S.C. § 1231(b)(3)(A)), that bar disappears if the Attorney General determines that Mumad has a "particularly serious crime" ("PSC") conviction. To Mumad, that undefined statutory term is void for vagueness because it gives the executive and judicial branches free rein to label *any* conviction a PSC. Alternatively, he challenges the Board of Immigration Appeals's decision to deny treaty-based relief. We deny Mumad's petition for review.

## I. Background

As a child in the Ethiopian state of Oromia, Mumad experienced violence, torture, and loss in the conflict between the Oromos and the Tigrayans, a rival ethnic group.[2] There, Mumad's father helped arm the Oromo Liberation Front. In turn, Tigrayan soldiers took Mumad's father into custody to question him about his dissident activities. Mumad never heard from him again.

A few years later, Tigrayan soldiers killed his mother. And, when Tigrayan soldiers set his house ablaze, one brother died inside, while Mumad and his other brother jumped from a second-story window. Tigrayan soldiers later killed that brother. Meanwhile, Mumad spent weeks in a coma.

Soon after, the United States welcomed the fourteen-year-old orphan as a refugee in Minnesota. Since then, he experienced homelessness and received mental-health diagnoses, including for post-traumatic-stress disorder. He also encountered legal trouble, receiving a juvenile-delinquency adjudication for sexually assaulting another minor, which triggered predatory-offender-registration duties.

---

[2]Because the Immigration Judge found Mumad's factual recitations credible and the Board affirmed, we work from those facts.

A few years later, a state court sentenced Mumad to serve a year-and-a-day for failing to register as a predatory offender. *See* Minn. Stat. § 243.166, subd. 5(a). Citing that conviction, DHS asked the Immigration Judge to rule that she could remove (i.e., deport) Mumad to Ethiopia.

Fearing that his ethnicity and his political views would mark him for death in Ethiopia, Mumad applied for asylum. Although the IJ denied that relief, she allowed Mumad to stay in the United States by granting withholding of removal under 8 U.S.C. § 1231(b)(3)(A). Seven years later, DHS wanted to end that withholding, citing intervening state criminal convictions and corresponding prison sentences: (1) 18 months for felony theft from a person; (2) 15 months for failing to register as a predatory offender; and (3) 33 months for simple robbery.[3]

The IJ granted DHS's request, finding that Mumad had committed multiple non-per-se PSCs. In particular, the IJ focused on Mumad's underlying conduct during the theft and simple robbery—namely, his threatened or actual use of physical force against people. For the theft conviction, the IJ looked at the state's allegations that Mumad "demanded the victim's cell phone," "put his arm around [her] neck[,]" and "put his hand over her mouth" when she screamed. For the simple robbery, Mumad took a cellphone from a van while another person struck the phone's owner.

And, while confirming that Mumad had experienced torture, the IJ denied Convention-Against-Torture relief because the state department described "evolving and improving" conditions in Ethiopia. That conclusion included electing Abiy Ahmed Ali, an ethnically Oromo prime minister. The IJ differentiated Ethiopia's ongoing and "[g]eneralized conditions of ethnic violence in the Oromo region" from Mumad's likelihood of torture. The Board affirmed. Now, Mumad asks us to review those decisions on constitutional, statutory, and treaty-based grounds.

---

[3]Minn. Stat. § 609.52, subd. 5(2)(1); *id.* § 243.166, subd. 5(a); *id.* § 609.24.

## II. Discussion

We review the Board's decision as the final agency action, including the IJ's findings and reasoning to the extent that the Board expressly adopted them. *See Fofanah v. Gonzales*, 447 F.3d 1037, 1040 (8th Cir. 2006). We review constitutional challenges like this one de novo. *Lasu v. Barr*, 970 F.3d 960, 964 (8th Cir. 2020).

Under the Immigration and Nationality Act, Congress directs the Attorney General to remove an alien from the country within ninety days of a removal order. 8 U.S.C. § 1231(a)(1)(A). But the Attorney General "may not remove an alien to a country if [it] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." *Id*. § 1231(b)(3)(A). We call this protection "withholding of removal."

But the IJ cannot grant that relief "if the Attorney General decides that: . . . the alien, having been convicted by a final judgment of a *particularly serious crime* is a danger to the community of the United States[.]" *Id*. § 1231(b)(3)(B)(ii) (emphasis added). Separately, the statute states that:

> an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. *The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime*[.]

*Id*. § 1231(b)(3)(B)(iv) (emphasis added).

Applying that text, we have concluded that a per se PSC exists when an aggravated felony (or felonies), 8 U.S.C. § 1101(a)(3), results in (at least) a five-year aggregate sentence. *Shazi v. Wilkinson*, 988 F.3d 441, 447–48 (8th Cir. 2021). Even for those crimes outside of the per se category, though, the Attorney General may

-4-

still decide that an alien committed a PSC based on § 1231(b)(3)(B)(ii)'s final sentence, which we emphasized. *Id*. at 448. So, we have identified that two PSC categories exist: (1) the per-se PSCs; and (2) the non-per-se PSCs.

## A. Vagueness

Mumad challenges only the non-per-se-PSC term (§ 1231(b)(3)(B)(ii)) as unconstitutionally vague, mainly because he argues that it gives DHS carte blanche to decide that any crime counts as a PSC.

Recently, we labeled the non-per-se PSC term—the part that Mumad challenges—as ambiguous. *Shazi*, 988 F.3d at 449. We did so after recognizing that "the statute and accompanying regulations merely define a category of per se [PSCs] but are otherwise silent[.]" *Id*. at 448 (citing 8 U.S.C. § 1231(b)(3)(B)(ii); 8 C.F.R. § 1208.16(d)). We also said that "[t]he statute provides no further guidance as to how the Attorney General should view other convictions outside of th[e] per se category[.]" *Id.* (discussing 8 U.S.C. § 1231(b)(3)(B)).

In reaching that conclusion, we expressly declined to read § 1231(b)(3)(B)(ii) as meaning "that every conviction outside of [the per-se-PSC] category requires a case-by-case analysis." *Id*. at 448 (disagreeing with *Gomez-Sanchez v. Sessions*, 892 F.3d 985 (9th Cir. 2018)); *see also id.* at 449 ("The B[oard], not the statute, created the traditional case-by-case analysis for those convictions falling outside of the per se category."). Rather, the "unqualified grant" to DHS bolstered our inclination to see congressional silence on the matter as "just that: silence." *Id*. at 449.

But "[a] statute is not necessarily void for vagueness simply because it may be ambiguous or open to two constructions." *Williams v. Brewer*, 442 F.2d 657, 660 (8th Cir. 1971). Mumad's vagueness challenge, then, needs more than ambiguity.

His challenge has some support. He points us to three Supreme Court cases that declared similarly worded "crime of violence" definitions as void for vagueness.[4]

The void-for-vagueness doctrine "rests on the twin constitutional pillars of due process and separation of powers." *See United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). "Vague laws contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them." *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

"Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect." *Id.* While only elected representatives can criminalize conduct, *see id.*, "[v]ague statutes threaten to hand responsibility for defining crimes to relatively unaccountable" officials in the judicial and executive branches, which "erod[es] the people's ability to oversee the creation of the laws they are expected to abide." *Id.* Vague, "standardless" statutes also "invite[] arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

---

[4]*United States v. Davis*, 139 S. Ct. 2319, 2336 (2019) (penalty's "crime of violence" definition from the Firearms Chapter of the criminal code, 18 U.S.C. § 924(c)(3)(B)); *see also* 18 U.S.C. § 924(c)(3)(B) ("[T]hat by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1234 (2018) (removability provision's "aggravated felony" definition from Immigration and Nationality Act, 8 U.S.C. § 1227(a)(2)(A)(iii), which cross-referenced the criminal code, 18 U.S.C. § 16); *see also* 18 U.S.C. § 16 ("[A]ny other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."); *Johnson v. United States*, 576 U.S. 591, 593–94 (2015) (sentencing enhancement's "crime of violence" definition under Armed Career Criminal Act's "violent felony" definition, 18 U.S.C. § 924(e)(2)(B)); *see also* 18 U.S.C. § 924(e)(2)(B) ("[O]r otherwise involves conduct that presents a serious potential risk of physical injury to another.").

In *Johnson*, *Dimaya*, and *Davis*, the Court took a "categorical approach." *E.g.*, *Johnson*, 576 U.S. at 596 (citing *Taylor v. United States*, 495 U.S. 575, 600 (1990) (deciding what counts as a "violent felony")). That approach analyzes "how the law defines the offense[,]" not how the individual committed it. *Id.* at 596; *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1252–53 (2018) (Thomas, J., dissenting) (summarizing the categorical approach).

Under the categorical approach, the challenged clauses in *Johnson*, *Dimaya*, and *Davis* created uncertainty about how to: (1) estimate the risk posed by the crime; and (2) set the threshold risk-level for a crime to fall within the definition. *See, e.g.*, *Johnson*, 576 U.S. at 597–98. As a result, the Court declared each clause void for vagueness. The upshot? A criminal punishment "made to depend on a judge's estimation of the degree of risk posed by a crime's *imagined 'ordinary case'*" will not stand. *Davis*, 139 S. Ct. at 2326 (emphasis added) (discussing *Johnson* and *Dimaya*).

The Court has not yet decided a vagueness challenge like Mumad's. Nor have we.[5] But a sister circuit has. *See Guerrero v. Whitaker*, 908 F.3d 541, 545 (9th Cir. 2018). In *Guerrero*, the Ninth Circuit concluded that the non-per-se PSC term was "not unconstitutionally vague on its face." *Id.* We agree with that conclusion yet take a somewhat different route to get there.

*Guerrero* observed that § 1231(b)(3)(B)(ii)'s text "requires the agency to place the alien's conviction along a spectrum of seriousness." *Id.* at 544. *Guerrero* also said that the text surrounding the provision shows that "the crime must allow an inference that the person is a 'danger to the community of the United States.'" *Id.* at 544–45. And, according to *Guerrero*, that same text "m[ade] clear that other crimes [beyond the per-se PSC], too, may be particularly serious." *Id.*

---

[5]In a pre-*Shazi* unpublished opinion, we rejected a vagueness challenge by citing *Guerrero v. Whitaker*, 908 F.3d 541, 545 (9th Cir. 2018), in a parenthetical. *Romero-Soriano v. Barr*, 762 F. App'x 359, 360 (8th Cir. 2019) (unpublished).

*Guerrero* also said it "kn[e]w with certainty that a minor traffic infraction" would not count as a PSC while "a heinous, violent crime" would. *Id*. at 545; *cf. Shazi*, 988 F.3d at 448. It saw § 1231(b)(3)(B)(ii) as "provid[ing] little guidance" for "the crimes in between[.]" *Guerrero*, 908 F.3d at 545. So, it characterized the text as "provid[ing] an uncertain standard to be applied to a wide range of fact-specific scenarios." *Id*.; *cf. Shazi*, 988 F.3d at 448. "But that kind of uncertainty" did not render the statute unconstitutionally vague. *Guerrero*, 908 F.3d at 545. Relying on an earlier Ninth Circuit decision—holding that the PSC analysis does not trigger *Taylor*'s categorical approach—*Guerrero* concluded that the non-per-se-PSC inquiry "applies only to real-world facts."[6] *Id*. (citing *Anaya-Ortiz v. Holder*, 594 F.3d 673, 680 (9th Cir. 2010)); *cf. Shazi*, 988 F.3d at 448.

Without saying that we can know "with certainty" what counts as a PSC, two textual limits save the statute. *Cf. Dimaya*, 138 S. Ct. at 1258 (Thomas, J., dissenting) ("This Court's 'traditional practice' is to 'refus[e] to decide constitutional questions' when other grounds of decision are available, 'whether or not they have been properly raised before us by the parties.'").

First, the "particularly serious" modifier places the non-per-se PSC in context: it must be excessive in quality or extent to some unusual degree. *See Particularly*, Webster's Third New Int'l Dictionary 1647 (2002) ("[I]n a special or unusual degree: to an extent greater than in other cases[.]"); *Serious*, Webster's Third New Int'l Dictionary 2073 (2002) ("Grave in . . . manner"); *id.* ("[S]uch as to cause considerable distress, anxiety, or inconvenience: attended with danger."); *see also* Dan Kesselbrenner & Lory D. Rosenberg, Immigr. Law & Crimes § 9:17 (2021) (using dictionary definitions to reach the "inescapable" conclusion that a non-per-se PSC "must be 'serious to a distinctively or notably unusual degree'"). Something

---

[6]This circuit has utilized the Board's "traditional case-by-case analysis" for the non-per-se PSCs. *See Shazi*, 988 F.3d at 449. But we have noted that "[t]he B[oard], not the statute, created" that case-by-case analysis. *Id.* So, we do not view *Shazi* as announcing definitively that the *statute's* text disclaims *Taylor*'s categorical approach.

cannot "be excessive . . . to some unusual degree" in the abstract. It needs something to measure itself (or get measured) against.

And second, we agree with the Ninth Circuit that the phrase "danger to the community of the United States" modifies what comes before it. *See Guerrero*, 908 F.3d at 544–45. So, only a crime that makes the alien a "danger to the community" can count as a non-per-se PSC.

Taken together, those textual limits save § 1231(b)(3)(B)(ii)'s non-per-se-PSC term from Mumad's vagueness challenge. The statute's text, while ambiguous, does more than apply to a crime's imagined, ordinary case. *Cf. Davis*, 139 S. Ct. at 2326. Because its text imposes standards that must reference underlying facts, the statute stands.

## B. Treaty Obligations

In the alternative, Mumad challenges what he views as the Board's failure to honor "non-refoulement" (i.e., non-return) standards under Article 33 of the United Nations Convention Relating to the Status of Refugees (Refugee Convention). He targets the Board's backward-looking PSC analysis when, he says, the Refugee Convention supports a present-and-forward-looking analysis. He views the former as a categorical ban on the latter. We see it differently.

We defer to the Board's determination that "the 'proper focus . . . is on the nature of the crime and not the likelihood of future serious misconduct.'" *Shazi*, 988 F.3d at 448. And once the Board decides that a non-per-se PSC exists, it "no longer engage[s] in a separate determination to address whether the alien is a danger to the community." *Id.* (quoting *Tian v. Holder*, 576 F.3d 890, 897 (8th Cir. 2009)). After determining that Mumad committed a PSC (past), the IJ did not need to conduct a

separate danger-to-the-community analysis (present or future). As a result, the Board did not err in upholding the IJ's decision.[7]

Mumad also argued that the Board failed to comply with customary international law and violated its duty to construe lingering ambiguities in his favor when interpreting the Refugee Convention's PSC exception. However, we reject this argument because domestic law—not a non-self-executing treaty—controls the PSC analysis. *See Purwantono v. Gonzales*, 498 F.3d 822, 824 (8th Cir. 2007).

## C. CAT

CAT provides another route around removal. *See Jama v. Wilkinson*, 990 F.3d 1109, 1117 (8th Cir. 2021). "An applicant is eligible for CAT relief if [he] proves that 'it is more likely than not that [he] . . . would be tortured if removed to the proposed country of removal.'" *Silvestre-Giron v. Barr*, 949 F.3d 1114, 1119 (8th Cir. 2020); *see* 8 C.F.R. § 1208.16(c)(2). "Torture . . . must be inflicted by or at the instigation of or with the consent or acquiescence of a public official[.]" *Silvestre-Giron*, 949 F.3d at 1119 (cleaned up); *see* 8 C.F.R. § 1208.18(a)(7) (public official's acquiescence).

On appeal, we review the Board's clear-error determination for substantial evidence. *Lasu*, 970 F.3d at 966. That means that we can only grant CAT relief if the record evidence is "so compelling that no reasonable factfinder could fail to find in [Mumad's] favor[.]" *Silvestre-Giron*, 949 F.3d at 1118.

Mumad seemingly concedes that his evidence does not meet the more-likely-than-not standard of proof. Our precedent rejects his contention that he could receive CAT relief for something below that proof standard (e.g., "substantial grounds for believing"). *See id.* at 1119. And so, Mumad's concession bars us from concluding

---

[7]Our conclusion moots Mumad's present-and-future-dangerousness-focused request for judicial notice.

-10-

that no reasonable factfinder could fail to find in his favor. As a result, we uphold the Board's CAT-relief denial.

## III. Conclusion

For these reasons, we deny Mumad's petition.

KELLY, Circuit Judge, concurring in part and concurring in the judgment.

I agree that the statutory term "particularly serious crime," 8 U.S.C. § 1231(b)(3)(B)(ii), is not unconstitutionally vague and does not conflict with the United States's obligations under the United Nations Convention Relating to the Status of Refugees (the Convention), but I differ in my analysis so write separately.

In my view, the court unnecessarily complicates our analysis of whether § 1231(b)(3)(B)(ii) is impermissibly vague by overlooking our precedent holding that the particularly serious crime analysis requires a case-by-case, factual approach. See Shazi v. Wilkinson, 988 F.3d 441, 447–48 (8th Cir. 2021); see also id. at 449 (noting that we had "adopt[ed] the BIA's position [that all reliable information may be considered in making a particularly serious crime determination] as the law of the circuit"). As the court notes, the prohibition of vagueness in statutes "rests on the twin constitutional pillars of due process and separation of powers." United States v. Davis, 139 S. Ct. 2319, 2325 (2019) (noting "the first essential of due process of law that statutes must give people of common intelligence fair notice of what the law demands of them" and the principle of separation of powers and democratic self-governance that "[o]nly the people's elected representatives in the legislature are authorized to make an act a crime" (cleaned up)). Under this doctrine, we may strike down as unconstitutional a law that violates these principles by being "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." Johnson v. United States, 576 U.S. 591, 595 (2015).

In recent years, the Supreme Court has applied this analysis three separate times to hold that residual clauses arguably comparable to § 1231(b)(3)(B)(ii) were unconstitutionally vague. See Johnson, 576 U.S. at 597; Sessions v. Dimaya, 138 S. Ct. 1204, 1216 (2018); Davis, 139 S. Ct. at 2326–27. In Johnson, the Supreme Court held that the residual clause of the Armed Career Criminal Act (ACCA)—defining "violent felony" as a crime that "involves conduct that presents a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii)—was unconstitutionally vague. See 576 U.S. at 597. Crucial to its reasoning, the Court noted that the residual clause required courts to use the "categorical approach" to determine whether an offense presented a serious potential risk of physical injury to another. See id. at 596 (citing Taylor v. United States, 495 U.S. 575, 600 (1990)). Under that framework, courts had to "assess[] whether a crime qualifie[d] as a violent felony in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." Id. (cleaned up). In other words, rather than looking at the facts of a defendant's particular crime to determine whether it was a violent felony, courts imagined at an abstract level what "kind of conduct . . . the crime involves in 'the ordinary case.'" Id.

In the Court's view, this framework "conspire[d] to make [the residual clause] unconstitutionally vague" for two reasons. See id. at 597. First, it "le[ft] grave uncertainty about how to estimate the risk posed by a crime," "t[ying] the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." Id. Second, it "le[ft] uncertainty about how much risk it takes for a crime to qualify as a violent felony." Id. at 598 ("It is one thing to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction."). Because the ACCA's residual clause bore these two uncertainties, the Court held that it violated due process. See id. at 601–02.

Likewise, in Dimaya, the Court held that a similarly worded residual clause, see 18 U.S.C. § 16(b) (defining "crime of violence" as "any other offense that is a

-12-

felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"), was unconstitutionally vague because it required courts to use the categorical approach and consequently "ha[d] the same two features as [the ACCA's residual clause], combined in the same constitutionally problematic way." Dimaya, 138 S. Ct. at 1211, 1213. And in Davis, the Court concluded that a nearly identical residual clause, see 18 U.S.C. § 924(c)(3), was unconstitutionally vague for the same reasons after confirming that the statute required courts to use the categorical approach, not a factual, case-specific approach. See Davis, 139 S. Ct. at 2326–27.

Importantly, the Court observed that "a case-specific approach would avoid the vagueness problems that doomed" the residual clauses in Johnson, Dimaya, and Davis. Id. at 2327; see also Johnson, 576 U.S. at 603–04 ("As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard . . . to real-world conduct."). In my view, this straightforward observation all but resolves Mumad's vagueness challenge. As we have repeatedly affirmed, the particularly serious crime inquiry requires a case-by-case analysis of "a variety of factors and consideration of the individual facts and circumstances of the conviction." Shazi, 988 F.3d at 447 (cleaned up) (quoting Marambo v. Barr, 932 F.3d 650, 655 (8th Cir. 2019)); see Tian v. Holder, 576 F.3d 890, 897 (8th Cir. 2009); see also In re N-A-M-, 24 I. & N. Dec. 336, 342 (BIA 2007). Under § 1231(b)(3)(B)(ii), an Immigration Judge (IJ) need not consider the judicially imagined ordinary case of a crime to operate the particularly serious crime analysis. Rather, they must consider real-world facts—"the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the [noncitizen] will be a danger to the community," Tian, 576 F.3d at 897 (quoting Matter of Frentescu, 18 I. & N. Dec. 244, 247 (BIA 1982))—to determine whether a noncitizen's crime was particularly serious.[8] Thus, the combination of

---

[8]This analysis may involve an "imprecise line-drawing exercise," Guerrero v. Whitaker, 908 F.3d 541, 545 (9th Cir. 2018), but "[m]any perfectly constitutional statutes" require courts to give meaning to "imprecise terms," Dimaya, 138 S. Ct. at

-13-

uncertainties that plagued the residual clauses in <u>Johnson</u>, <u>Dimaya</u>, and <u>Davis</u> are not present here, and the "particularly serious crime" definition is not unconstitutionally vague. <u>See</u> <u>Guerrero v. Whitaker</u>, 908 F.3d 541, 545 (9th Cir. 2018); <u>accord</u> <u>Romero-Soriano v. Barr</u>, 762 F. App'x 359, 360 (8th Cir. 2019) (per curiam).

Separately, I view Mumad's treaty-based challenge to § 1231(b)(3)(B)(ii) to assert that the non-refoulement obligation under Article 33 of the Convention *requires* IJs to make an independent, "present-and-forward-looking" finding that a noncitizen is a danger to the community in order to conclude they are ineligible for withholding of removal. But, as we have noted, the United Nations Protocol Relating to the Status of Refugees, pursuant to which the United States acceded to the obligations of the Convention, <u>see</u> <u>I.N.S. v. Cardoza-Fonseca</u>, 480 U.S. 421, 436–37 (1987), "is not self-executing" and is "not judicially enforceable law in the United States." <u>Purwantono v. Gonzales</u>, 498 F.3d 822, 824 (8th Cir. 2007) (cleaned up); <u>see also</u> <u>Bertrand v. Sava</u>, 684 F.2d 204, 219 (2d Cir. 1982) ("[T]he Protocol affords the petitioners no rights beyond those they have under our domestic law."). Therefore, Mumad can only challenge the BIA's PSC analysis[9] as an improper interpretation of domestic law (i.e., the Immigration and Nationality Act), but we

_____

1214; <u>see</u> <u>Johnson</u>, 576 U.S. at 604 ("[T]he law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." (quoting <u>Nash v. United States</u>, 229 U.S. 373, 377 (1913))). And as the court suggests, the statute provides some textual guidance for this analysis. First, the crime must be *particularly* (i.e., especially) serious. 8 U.S.C. § 1231(b)(3)(B)(ii). Second, the crime must permit the inference that the noncitizen is "a danger to the community of the United States." <u>Id.</u> And third, the crime should be comparable to an aggravated felony resulting in a sentence of at least five years, a per se particularly serious crime. <u>See</u> <u>id.</u> § 1231(b)(3)(B).

[9]"[O]nce a[] [noncitizen] is found to have committed a particularly serious crime, we no longer engage in a separate determination to address whether the [noncitizen] is a danger to the community. The proper focus . . . is on the nature of the crime and not the likelihood of future serious misconduct." <u>Tian</u>, 576 F.3d at 897 (cleaned up) (quoting <u>In re N-A-M-</u>, 24 I. & N. Dec. at 342).

-14-

have already held the BIA's approach is a reasonable interpretation of the statute to which we defer.  See Shazi, 988 F.3d at 448 (citing Tian, 576 F.3d at 897).

For these reasons, I concur in the judgment denying the petition for review.

_____