[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-10271

_____

K.Y.,

Petitioner-Appellant,

versus

U.S. ATTORNEY GENERAL,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A061-394-881

_____

Before NEWSOM, MARCUS, Circuit Judges, and MIDDLEBROOKS,[*] District Judge.

PER CURIAM:

This is an appeal of a final order of removal issued by the Board of Immigration Appeals ("Board") on December 16, 2020 as to Petitioner K.Y., a native and citizen of Guyana. An Immigration Judge determined that K.Y. was ineligible for asylum and withholding of removal because she was convicted of a particularly serious crime and denied her application for protection under the Convention Against Torture ("CAT"), and the Board affirmed her decision without opinion. K.Y. raises three challenges to these proceedings in this appeal: (1) that the Immigration Judge did not give reasoned consideration to all of the relevant evidence in determining that K.Y. had not met her burden of showing that she would more likely than not be tortured by, or with the acquiescence of, the Guyanese government if returned to Guyana, or that her conclusion was not supported by substantial evidence; (2) that the Immigration Judge erred in not making a separate determination that K.Y. posed a danger to the community, in addition to finding that she had committed a particularly serious crime; and (3) that the Immigration Judge erred in finding that K.Y. committed a particularly serious crime.

---

[*] Honorable Donald M. Middlebrooks, United States District Judge for the Southern District of Florida, sitting by designation.

After careful review, and with the benefit of oral argument, we deny the petition for review in part and dismiss in part.

I

A

K.Y. is a transgender woman who has been living in the United States as a lawful permanent resident since January 23, 2011. Her parents are naturalized United States citizens. She is originally from Guyana, a country on the northern coast of South America. K.Y. lived in Guyana for over twenty-five years before coming to the United States. During that time, she identified as a gay man, but she kept her identity a secret because "homosexuality is condemned in Guyana" and is illegal. In 2015, after moving to the United States, K.Y. began living openly as a transgender woman.

About four years after becoming a lawful permanent resident, in early 2015, K.Y. sought sexually explicit images, discussed performing different sex acts, and arranged a meeting with an undercover police officer pretending to be a 15-year-old boy. The police officer made repeated references to his underage status throughout his communication with K.Y., but K.Y. was undeterred. She went to meet the "boy," and she was arrested. She was carrying lube and "poppers," which are used to assist in anal sex, at the time of her arrest.

As a result of this offense, K.Y. pleaded *nolo contendere* to two sex crimes involving a minor: (1) traveling to meet a minor in violation of Fla. Stat. § 847.0135(4)(a); and (2) soliciting a child for

unlawful sexual conduct using computer services or devices in violation of Fla. Stat. § 847.0135(3)(a). She was sentenced to 42 months' imprisonment, followed by 10 years' probation, and was required to register as a sex offender.

Under 8 U.S.C. § 1227(a)(2)(A)(i), a noncitizen who, within five years of her admission, is convicted of a crime involving moral turpitude for which a sentence of one year or longer may be imposed, is subject to removal. Pursuant to this statute, on April 22, 2020, the Department of Homeland Security initiated removal proceedings against K.Y. by filing a Notice to Appear in Immigration Court. K.Y. admitted the factual allegations in the Notice and conceded the charge of removability but applied for asylum, withholding of removal, and CAT protection because she feared she would be tortured in Guyana for being transgender. She supported her application with a number of documents discussing discrimination against lesbian, gay, bisexual, and transgender ("LGBT") individuals in Guyana, including in schools, employment, and healthcare. These documents also indicated that Guyanese law enforcement "commonly . . . mocked" individuals for their sexual orientation, some officers used anti-cross-dressing laws that were not enforced to "threaten and harass LGBT persons into paying bribes," and other officers refused to take reports from LGBT persons.

## B

On June 29, 2020, at a hearing on K.Y.'s application for asylum, the presiding Immigration Judge heard testimony from K.Y.

and her country conditions expert, Professor James Wilets. The Immigration Judge found both of their testimonies credible.

K.Y. explained that when she lived in Guyana, she identified as a gay man, but she kept her identity a secret out of fear. Her fear was based, in part, on three instances of violence or threats of violence she personally observed: one, at a bar, she saw a group of men physically attack a "feminine" man while using derogatory slurs, which culminated in the "feminine" man being stabbed in the abdomen with a beer bottle; two, at a regatta, a group of men approached K.Y. while she was wearing "fitted" clothing and threatened to beat her up, stating that they "burn[ed] [her] type"; and, three, while riding her motorcycle, a police officer stopped K.Y., asked her if she "was left or right," and extorted money from her. Fortunately, K.Y. was never the victim of any physical violence while she lived in Guyana. She attributes this to her efforts to conceal her sexual orientation and identity.

K.Y.'s country conditions expert, Professor Wilets, testified that a transgender person is much more likely than other LGBT persons to experience violence in Guyana. As a result, he opined that K.Y. would face "considerable" danger and "general persecution" if she were to return to Guyana, and that "it would be really [ ] extraordinary if [Petitioner] did not experience physical violence." He further testified that the police in Guyana did not "target the [LGBT] community," but that officers were "unwilling to help" or "in some cases, actually [were] part of the violence against gay people."

After considering the testimony of K.Y. and her expert and the other evidence presented, the Immigration Judge denied K.Y.'s application for relief and protection and ordered her removed to Guyana. She determined that the plain language of the statute criminalizing traveling to meet a minor "indicate[d] a dangerousness that causes it to fall within the ambit of a particularly serious crime," and, as such, K.Y. was not eligible for asylum or withholding of removal. The Immigration Judge also denied K.Y.'s application for CAT deferral, finding that the discrimination and extortion K.Y. experienced did not rise to the level of torture, and that K.Y. had not shown a likelihood of future torture by the Guyanese government. K.Y. appealed, and the Board affirmed the Immigration Judge's decision without opinion. This appeal followed. We address each of K.Y.'s arguments in turn.

## II

### A

First, K.Y. argues that the Board's determination—namely, that she had not shown that she would more likely than not be tortured if she is returned to Guyana—was not supported by substantial evidence, or, alternatively, that the Immigration Judge did not give reasoned consideration to the evidence. We disagree as to the former argument and lack jurisdiction to review the latter.

We analyze the Immigration Judge's conclusions because the Board affirmed without opinion. *Mutua v. U.S. Att'y Gen.*, 22 F.4th 963, 967–68 (11th Cir. 2022).  The Immigration Judge's legal

conclusions are reviewed *de novo*, and her findings of fact must be supported by substantial evidence. *Perez-Zenteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1306 (11th Cir. 2019). "Under this highly deferential standard of review, the [immigration judge]'s decision can be reversed only if the evidence 'compels' a reasonable fact finder to find otherwise." *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230 (11th Cir. 2005) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)).

To qualify for CAT protection, K.Y. bears the burden of showing either (1) that it is more likely than not that she would be tortured by her government if she is returned to Guyana, or (2) that it is more likely than not that with the instigation, consent, or acquiescence of a public official or other person acting in an official capacity, she would be tortured if she is returned to Guyana. *See* 8 C.F.R. §§ 1208.16(c), 1208.18(a). "Torture" is defined as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind
> . . .

*Id.* § 1208.18(a)(1). It is an "extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to

torture." *Id.* § 1208.18(a)(2); *see Perez-Guerrero v. U.S. Att'y Gen.*, 717 F.3d 1224, 1232 (11th Cir. 2013). In addition, to qualify as "torture" an act must be inflicted outside the realm of lawful sanctions by, at the instigation of, or with the consent or acquiescence of a public official or other person acting in an official capacity. 8 C.F.R. § 1208.18(a)(1), (3). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7); *Rodriguez Morales v. U.S. Att'y Gen.*, 488 F.3d 884, 891 (11th Cir. 2007) (citing *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242 (11th Cir. 2004)).

In determining whether an applicant is entitled to CAT protection, "all evidence relevant to the possibility of future torture shall be considered," including (1) whether the applicant has experienced past torture; (2) whether she could avoid future torture by relocating within the country; and (3) evidence about wider country conditions, including whether there have been gross, flagrant or mass violations of human rights in the country. *See* 8 C.F.R. § 1208.16(c). The evidence must demonstrate that the applicant will be *specifically* and *individually* targeted for torture. *Jean-Pierre v. U.S. Att'y Gen.*, 500 F.3d 1315, 1324 (11th Cir. 2007); *In re J-E*, 23 I&N Dec. 291, 300–01 (BIA 2002) (en banc).

The Immigration Judge determined that K.Y. had not met this high burden because, while she pointed to evidence of discrimination and even physical violence against the LGBT population in

Guyana, she had not pointed to any evidence suggesting that she, *specifically* and *individually*, would be tortured by Guyanese officials. While K.Y. had recounted instances of being personally *extorted* by the police in Guyana, this is not the same as torture. She noted that K.Y. did not describe experiencing past harm in Guyana rising to the level of torture, either by a private actor or government official, including when she returned to Guyana for one week in 2011. Based on this, the Immigration Judge found that K.Y.'s claim was "insufficiently supported by the record to meet the CAT's high 'more likely than not' burden."

Turning to the acquiescence prong, the Immigration Judge found that the evidence did not establish that the Guyanese government would more likely than not acquiesce in K.Y.'s supposed torture. She acknowledged that the record evinced widespread harassment and discrimination against LGBT individuals, as well as some acts of violence that did rise to the level of torture. However, the Immigration Judge also found that the evidence demonstrated that the Guyanese government has taken steps in recent years to improve country conditions for the LGBT population in Guyana, including hosting a gay pride parade and allowing a number of active LGBT advocacy organizations to operate freely. Moreover, the Immigration Judge found that the country conditions evidence indicated that the police did not enforce the laws criminalizing same-sex relations, except to extort bribes, and that the Guyanese

government had agreed to abide by a recent decision of the Caribbean Court of Justice that overturned its prohibition of cross-dressing.

K.Y. presents two reasons she believes the Immigration Judge erred, although she conflates them in her briefing: either because the Immigration Judge did not give reasoned consideration to the evidence, or because her conclusions were not supported by substantial evidence. Notably, K.Y.'s "substantial evidence" argument is a separate claim from her "reasoned consideration" argument, and it is analyzed under a different standard of review. *Compare Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 799 (11th Cir. 2016) ("[A]n assertion that the agency failed to give reasoned consideration to an issue is a question of law that we review *de novo*."), *with Priva v. U.S. Att'y Gen.*, 34 F.4th 946, 957 (11th Cir. 2022) ("In reviewing a factual challenge to the denial of CAT relief, we apply the substantial evidence standard of review."). A "reasoned-consideration examination does not look to whether the agency's decision is supported by substantial evidence." *Jeune*, 810 F.3d at 803. "Rather, it looks to see whether the agency has considered the issues raised and announced its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Id.* (cleaned up); *see also Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1305 (11th Cir. 2015) ("Cases discussing our review of administrative findings of fact under the substantial-evidence test are inapplicable to the question of whether the BIA's

decision exhibits reasoned consideration."). Thus, we address each argument separately.

K.Y. first contends that the Immigration Judge did not give reasoned consideration to all the evidence that she would probably be tortured if she returned to Guyana as a transgender woman.

But K.Y. did not present her "reasoned consideration" argument below and, as a result, we lack jurisdiction to review it. "We have held that failure to raise an issue to the B[oard] constitutes a failure to exhaust." *Bing Quan Lin v. U.S. Att'y Gen.*, 881 F.3d 860, 867 (11th Cir. 2018). We have "also determined that the failure to exhaust is jurisdictional, 'so we lack jurisdiction to consider claims that have not been raised before the B[oard].'" *Id.* (quoting *Sundar v. INS*, 328 F.3d 1320, 1323 (11th Cir. 2003)); *see* 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right[.]"). K.Y.'s "arguments about the sufficiency of the IJ's reasoning . . . were never raised [before] the [Board] and have not been administratively exhausted." *Bing Quan Lin*, 881 F.3d at 869. "Thus, to the extent [K.Y.] claims that the Immigration Judge's order reflected inadequate consideration or insufficient explanation, we cannot examine that claim." *Id.*

But even if K.Y. had presented the argument below, it would still fail on the merits. An immigration judge will be found to have given reasoned consideration to the evidence unless she "misstates the contents of the record, fails to adequately explain [her] rejection of logical conclusions, or provides justifications for [her] decision

which are unreasonable and which do not respond to any arguments in the record." *Ali v. U.S. Att'y Gen.*, 931 F.3d 1327, 1334 (11th Cir. 2019) (quoting *Jeune*, 810 F.3d at 803). The Immigration Judge did not do any of these things. The record reflects that she carefully considered the evidence presented about country conditions in Guyana, and the risks that K.Y. might face if she were returned there. That the Immigration Judge reached a different decision than K.Y. would have liked does not mean that she did not give reasoned consideration to the evidence.

K.Y. also argues that the Immigration Judge's conclusion was not supported by substantial evidence. We disagree. Under the first prong of the regulation, the Immigration Judge's conclusion that K.Y. had not met her burden of demonstrating that she would be tortured by the Guyanese government was supported by substantial evidence. The Immigration Judge acknowledged K.Y.'s testimony that she "strongly fear[s] [for] [her] life" and that she fears "being killed due to [her] feminine traits, such as [her] choice of apparel or . . . overall physical appearance" as a transgender woman. However, the Immigration Judge found that the evidence did not satisfy the high burden of establishing that K.Y. would "more likely than not" be tortured by, at the instigation of, or with the consent or acquiescence of a public official or person acting in an official capacity, even if it "indicates that Guyanese police at times harass or extort LGBTI persons." Extortion or discrimination

are not the same as torture. *See Perez-Guerrero*, 717 F.3d at 1232. This conclusion was supported by the record.

Moreover, as the Immigration Judge observed, the country conditions report states that the government does not enforce its prohibition on same-sex relations, and the government agreed to abide by the Caribbean Court of Justice's decision that overturned its prohibition on cross-dressing. *See Reyes-Sanchez*, 369 F.3d at 1243 ("The Board was entitled to rely heavily on" State Department country conditions reports). The Immigration Judge did not conclude that the Guyanese police force engaged in *no* misconduct; rather, she considered the evidence of misconduct presented by K.Y.—as she was required to do—and arrived at the decision that, while repugnant, this misconduct rose only to the level of harassment, discrimination, and extortion—not torture. This finding was supported by K.Y.'s own experience with the police: while K.Y. testified that a police officer questioned her as to her sexual orientation and ultimately demanded a bribe, K.Y. did not testify that she had ever been harmed by the Guyanese government, or by any other person. Finally, the Immigration Judge properly observed that the record did not establish that the Guyanese government engages in torture as a practice, which further supports her conclusion that K.Y. had not satisfied her burden here. *See* 8 C.F.R. § 1208.16(c)(3) (explaining that whether there are mass violations of

human rights is a relevant factor in determining whether there is a likelihood of future torture).

As to the acquiescence prong, the Immigration Judge's findings were here too supported by the record. While it is true that Guyana criminalizes consensual same-sex relations, the Immigration Judge found that the record established that the police do not enforce that law, except to sometimes extort bribes, and that the Guyanese government had agreed to honor a recent decision from the Caribbean Court of Justice that overturned the prohibition on cross-dressing. That the Guyanese government has taken affirmative steps to ensure the safety of the LGBT community suggests that it is unlikely that the Guyanese government would condone torture against K.Y., even if those steps have not yet entirely eliminated harassment and violence against the LGBT community. *See Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1294 (11th Cir. 2020) ("A government does not acquiesce to torture where it actively, albeit not entirely successfully, combats the alleged torture."). These steps included efforts by the police to prevent mistreatment and abuse and permitting a gay pride parade.

In sum, while we agree that the evidence K.Y. presented demonstrated pervasive and disturbing discrimination and harassment against the LGBT community in Guyana, the Immigration Judge's determination that K.Y. had not established that it was more likely than not that she would be tortured by or with the acquiescence of the government if she returned to Guyana was supported by substantial evidence. We will only disturb the agency's

factual findings when "the record not only supports reversal, but compels it." *Perez-Zenteno*, 913 F.3d at 1306. Simply put, that is not the case here.

**B**

Second, K.Y. argues that, as a prerequisite to denying CAT protection, the Board was required to make a separate determination that she posed a danger to the community, in addition to finding that she had committed a particularly serious crime. Her argument is based on her reading of 8 U.S.C. §§ 1158(b)(2)(A)(ii) and 1231(b)(3)(B)(ii). These provisions bar eligibility for asylum and withholding of removal for "an alien . . . if the Attorney General decides that . . . the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." 8 U.S.C. § 1231(b)(3)(B)(ii); *see also id.* § 1158(b)(2) (similar). The entirety of K.Y.'s argument centers on the fact that "having been convicted of a particularly serious crime" is an appositive phrase describing "the alien." K.Y. contends that because of this grammatical feature, the statute plainly and unambiguously requires a separate determination to be made about whether the noncitizen is a danger to the community. Otherwise, according to K.Y., the statute need only say that someone who has been convicted of a particularly serious crime is ineligible, and the second half of the sentence would be superfluous.

The Government argues that we need not consider K.Y.'s argument because she did not raise it before the Board below, and this Court therefore does not have jurisdiction to consider it. As

discussed above, immigration petitioners must raise issues before the agency before presenting them on appeal. *See* 8 U.S.C. § 1252(d)(1); *Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006). "[T]o exhaust a claim before the B[oard], it is not enough that the petitioner has merely identified an issue to that body. A petitioner has not exhausted a claim unless [s]he has both raised the 'core issue' before the B[oard], and also set out any discrete arguments [s]he relies on in support of that claim." *Jeune*, 810 F.3d at 800. If an issue is not first raised to the agency, the court of appeals does not have jurisdiction to consider it.

There are a few limited exceptions to this rule, two of which K.Y. argues apply here. *See Sundar*, 328 F.3d at 1325. First, she argues that she did not need to exhaust her statutory interpretation argument because raising it below "would have been futile" given the Immigration Judge's "repeated indications that a determination that Petitioner had been convicted of a particularly serious crime, in and of itself, would bar her eligibility for asylum and withholding of removal." Alternatively, K.Y. argues that the exhaustion requirement does not apply because, given Eleventh Circuit precedent holding that no separate dangerousness determination is required, the Board could not provide K.Y. any remedy because it would be bound by that precedent. *See Crespo-Gomez v. Richard*, 780 F.2d 932, 934–35 (11th Cir. 1986).

We are not persuaded that any of the exceptions to the exhaustion requirement apply here. To start, there is no "perceived futility" exception. *Sundar*, 328 F.3d at 1325 And to the extent there

is an exception where the agency "does not have the power to adjudicate" a claim, *id.*, we are not convinced that it would apply in this case. Because of *Chevron*, "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83 (2005); *see Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843–45 (1984). Our decision in *Crespo-Gomez v. Richard* didn't "hold "that its construction [of the term "particularly serious crime"] follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." 780 F.2d at 934–95; *see also Brand X*, 545 U.S. at 982. And so K.Y. could have argued to the Board that it should have adopted her statutory interpretation—an argument that the Board has frequently accepted in the past. *See, e.g.*, *Matter of M-H-*, 26 I. & N. Dec. 46, 49 (BIA 2012) (relying on *Brand X* to reject a Third Circuit interpretation in a case arising in the Third Circuit, because the precedent on point "did not expressly determine that the language in question was unambiguous"); *Matter of D-R-*, 27 I. & N. Dec. 105, 108, 112 (BIA 2017) (similar); *Matter of Agustin Valenzuela Gallardo*, 25 I. & N. Dec. 838, 840–44 (BIA 2012) (similar); *Matter of Saiful Islam*, 25 I. & N. Dec. 637, 641 (BIA 2011) (similar). K.Y.'s effort may have failed. But the important

point is that making her argument to the Board was an avenue for relief that was "available to [her] as of right." 8 U.S.C. § 1252(d)(1).

Moreover, the interpretation of immigration statutes and regulations is precisely the type of question that the Board is uniquely positioned to answer, as courts typically defer to the Board's "construction of the statute which it administers." *Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 531 (11th Cir. 2013). Accordingly. K.Y. did not properly exhaust her claim, and we lack jurisdiction to consider it.

But even if we had jurisdiction to consider it, K.Y.'s argument is squarely foreclosed by this Court's precedent. In *Crespo-Gomez*, we held that "the fact that the alien has committed a particularly serious crime makes the alien dangerous within the meaning of the statute." 780 F.2d at 934. We clarified that the statute does not "require[] two separate findings: first that the alien committed a particularly serious crime, and second that the alien constitutes a danger" because it "does not connect its two clauses with a conjunction; rather the statute sets forth a cause and effect relationship." *Id.* at 934; *see also Lapaix v. U.S. Att'y Gen.*, 605 F.3d 1138, 1141 n.2 (11th Cir. 2010) (explaining that "[p]articularly serious crimes render aliens ineligible for asylum and withholding of removal" because "[c]onviction of a particularly serious crime necessarily renders one a danger to the community"). Other circuits that have considered the issue have reached the same conclusion. *See, e.g., Choeum v. INS*, 129 F.3d 29, 42–44 (1st Cir. 1997); *Flores v. Holder*, 779 F.3d 159, 167 (2d Cir. 2015); *Nkomo v. Att'y Gen.*,

930 F.3d 129, 135 (3d Cir. 2019); *Gao v. Holder*, 595 F.3d 549, 555 n.1 (4th Cir. 2010); *Martins v. INS*, 972 F.2d 657, 661 (5th Cir. 1992) (per curiam); *Hamama v. INS*, 78 F.3d 233, 240 (6th Cir. 1996); *Garcia v. INS*, 7 F.3d 1320, 1323–26 (7th Cir. 1993); *Mumad v. Garland*, 11 F.4th 834, 840 (8th Cir. 2021); *Gomez-Sanchez v. Sessions*, 892 F.3d 985, 991 (9th Cir. 2018); *Kankamalage v. INS*, 335 F.3d 858, 861 n.2 (9th Cir. 2003).

## C

Finally, K.Y. argues that the Board's determination that traveling to meet a minor to engage in sexual conduct is a particularly serious crime, at least in view of the facts of this case, was not reasonable. Before addressing that issue, though, we must determine whether we have jurisdiction to review the Board's determination.[1]

This Court does not have jurisdiction to review any "decision or action of the Attorney General," "the authority for which is specified under [the INA] to be in the discretion of the Attorney General." 8 U.S.C. § 1252(a)(2)(B)(ii). But we may review "questions of law," *id.* § 1252(a)(2)(D), which the Supreme Court has

---

[1] Although the parties have not raised this issue, "[e]very federal appellate court has a special obligation to satisfy itself . . . of its own jurisdiction . . . even though the parties are prepared to concede it." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) (quotation omitted)).

construed to include mixed questions of law and fact, *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068–69 (2020).

Here, there are two provisions that use the "particularly serious crime" language and potentially implicate our jurisdiction. The first says that an alien is ineligible for asylum "if the Attorney General determines that . . . the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii). The second parallels the first, declaring that an alien is ineligible for withholding of removal "if the Attorney General decides that . . . the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." *Id.* § 1231(b)(3)(B)(ii). The jurisdictional issue, then, turns on whether the Attorney General's "determin[ation]" or "deci[sion]" that a crime is "particularly serious" is a matter of discretion insulated from our review.

We hold that it is not. The text of the INA's jurisdiction-stripping provision extends only to those decisions which are "specified" by statute "to be in the [Attorney General's] discretion." *Id.* § 1252(a)(2)(B)(ii); *see Soltane v. U.S. Dep't of Justice*, 381 F.3d 143, 146 (3d Cir. 2004) (Alito, J.) ("The key to § 1252(a)(2)(B)(ii) lies in its requirement that the discretion giving rise to the jurisdictional bar must be 'specified' by statute."). "To 'specify' that a decision belongs to the Attorney General's discretion requires more than a hint." *Berhane v. Holder*, 606 F.3d 819, 821 (6th Cir. 2010). After all, the word "'specify' means to 'name or state explicitly or in

detail.'" *Kucana v. Holder*, 558 U.S. 233, 243 n.10 (2010) (quoting Webster's New Collegiate Dictionary 1116 (1974)). And neither § 1158(b)(2)(A)(ii) nor § 1231(b)(3)(B)(ii) contains such an explicit designation of discretion. *See Delgado v. Holder*, 648 F.3d 1095, 1100 (9th Cir. 2011) (en banc).

To be sure, whether a crime is "particularly serious" is something that the INA says the Attorney General "determines" or "decides." "But empowering the Attorney General to 'determine[]' (or for that matter 'decide[]') something no more 'specif[ies]' 'discretion' than empowering the Attorney General to exercise any number of responsibilities under the Act." *Berhane*, 606 F.3d at 822 (alterations in original). Indeed, if "discretion" meant "'nothing more than the application of facts to principles'"—or any of the "other traditional actions of the Attorney General" that one might characterize as "determinations" or "decisions"—then "it would be difficult to envision 'any action by the Attorney General' that would not get caught in the jurisdiction-stripping provision's orbit." *Id.* (quoting *Soltane*, 381 F.3d at 148 n.3). That counsels against an overly broad reading of § 1252(a)(2)(B)(ii).

It is also telling that "Congress knows how to 'specify' discretion and has done so repeatedly"—at least thirty times—"in other provisions of the INA." *Alaka v. Att'y Gen. of the U.S.*, 456 F.3d 88, 97 & nn. 16, 17 (3d Cir. 2006) (collecting statutes that give "discretion" to the Attorney General). "If Congress had wanted to specify the discretion to make the 'particularly serious' determination," one would expect that "it would have employed the same

explicit language used in other provisions of the same statute." *Id.* at 98. But it did not.

Finally, even if there were "[a]ny lingering doubt about the proper interpretation of 8 U.S.C. § 1252(a)(2)(B)(ii)," it "would be dispelled by a familiar principle of statutory construction: the presumption favoring judicial review of administrative action." *Kucana*, 558 U.S. at 251. Because that presumption is "well-settled," we must "assume[] that 'Congress legislates with knowledge of' the presumption." *Id.* at 252 (quotation omitted). "The presumption can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." *Guerrero-Lasprilla*, 140 S. Ct. at 1069 (quotation omitted). And no such evidence exists here.

Accordingly, consistent with almost every circuit that has addressed the issue, we hold that the INA "does not abate our power to review the decision that [K.Y.] was convicted of a particularly serious crime." *Nethagani v. Mukasey*, 532 F.3d 150, 155 (2d Cir. 2008); *accord Aviles-Tavera v. Garland*, 22 F.4th 478, 485 (5th Cir. 2022); *Valerio-Ramirez v. Sessions*, 882 F.3d 289, 295 (1st Cir. 2018); *Berhane*, 606 F.3d at 822–23; *Alaka*, 546 F.3d at 95–96.

And so we reach the merits of the Board's "particularly serious crime" determination. We note that the standard of review to be applied in reviewing such a determination appears to be the subject of a circuit split. *Compare Luziga v. Att'y Gen. of the U.S.*, 937 F.3d 244, 252 n.9 (3d Cir. 2019) (reviewing the issue *de novo*), *with Arbid v. Holder*, 700 F.3d 379, 383 (9th Cir. 2012) (applying abuse

of discretion). But we need not decide that issue because K.Y.'s claim fails under any standard of review.

A crime can either be particularly serious *per se*, or based on an individualized determination by the Attorney General (which can be delegated to other administrative bodies, including immigration judges). *See Lapaix*, 605 F.3d at 1143. Here, the Immigration Judge made the individualized determination that the crime was particularly serious because the plain language of the statute "indicate[d] a dangerousness that causes it to fall within the ambit of a particularly serious crime." That language reads:

> (4) Traveling to meet a minor.—Any person who travels any distance whether within this state, to this state, or from this state by any means, who attempts to do so, or who causes another to do so or attempt to do so for the purpose of engaging in any illegal act described in chapter 794 [sexual battery], chapter 800 [lewdness, indecent exposure], or chapter 827 [abuse of children], or to otherwise engage in other unlawful sexual conduct with a child or with another person believed by the person to be a child after using a computer online service, Internet service, local bulletin board service, or any device capable of electronic data storage or transmission to:
>
>> (a) Seduce, solicit, lure, or entice or attempt to seduce, solicit, lure, or entice a child or another person believed by the person to be a child, to engage in any illegal act described in chapter 794 [sexual battery], chapter 800 [lewdness,

> indecent exposure], or chapter 827 [abuse of
> children], or to otherwise engage in other un-
> lawful sexual conduct with a child[.]

Fla Stat. § 847.0135(4)(a). And, as interpreted by Florida courts, the elements required to satisfy this statute are "(1) knowingly traveling within this state, (2) for the purpose of engaging in any illegal act (in violation of chapters 794 [sexual battery], 800 [lewdness, indecent exposure], or 827 [abuse of children], or other unlawful sexual conduct) with the victim after using a computer or other electronic data storage transmission to contact a child, (3) the victim was a child or person believed by the defendant to be a child, and (4) the defendant seduced, solicited, lured, enticed or attempted to do so to engage in the illegal act or unlawful sexual conduct." *Hartley v. State*, 129 So.3d 486, 491 (Fla. Dist. Ct. App. 2014).

K.Y. argues that, regardless of the statutory text, traveling to meet a minor is not a particularly serious crime under the facts presented here because "the offense did not require or involve the intent to use, or actual use of, force or violence" and "[t]here was no actual endangerment or harm to the class of persons the statute is intended to protect, i.e., an underage individual." But neither of those factors are required to make a crime particularly serious, and the Board did not err in finding that K.Y.'s conviction nevertheless rises to this level. The plain language of the statute requires a perpetrator to knowingly attempt to engage in unlawful sexual conduct or some other illegal act, like abuse, with a person the perpetrator believes is a child. Fla. Stat. § 847.0135(4)(a). It is no analytical

strain to conclude that this is particularly serious in several respects. For one, it is a crime directed at a person, not property. *See Matter of R-A-M-*, 25 I. & N. Dec. 657, 662 (BIA 2012) (explaining that "an offense is more likely to be considered particularly serious if it is against a person"). Worse, it involves a vulnerable population—children. *See Thompson v. Barr*, 922 F.3d 528, 533 (4th Cir. 2019) ("Sexual abuse of children always involves preying on the vulnerable . . . ."). Moreover, the *mens rea* requires the perpetrator to *knowingly* attempt to solicit a person believed to be a child to engage in sexual conduct. And the harm the statute targets—sexual abuse—is likewise serious. This seriousness is reflected by the lengthy 42-month sentence K.Y. served for her crime, as well as the requirement that she register as a sex offender.

On top of that, the Immigration Judge highlighted the "deeply troubl[ing]" features of K.Y.'s crime. Her actions did not result from a mere "lapse in judgment." Rather, after being told "multiple times" that she was talking to a minor, K.Y.—who was 30 at the time—repeatedly requested nude images and asked to meet up to engage in various sexual acts. This misconduct occurred over the course of several weeks. And when K.Y. finally arrived for a meetup, she appeared more than ready to have sex with a minor. She showed up with condoms, lubricant, and poppers, and a CVS receipt showed that some of those items had been purchased "just prior to arriving on [the] scene." Add that all up, and the details of the crime easily "allow an inference that [K.Y.] is a 'danger to the

community of the United States.'" *Guerrero v. Whitaker*, 908 F.3d 541, 544–45 (9th Cir. 2018).

Based on these factors, we find that the Board did not err when it found that K.Y.'s conviction constituted a particularly serious crime.

★  ★  ★

For the foregoing reasons, we **DENY** the petition in part and **DISMISS** it in part.