[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-13857

Non-Argument Calendar

_____

JOSE M. RUVIRA GUERRA,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A024-655-569

_____

Before Newsom, Abudu, and Anderson, Circuit Judges.

PER CURIAM:

Jose Ruvira Guerra petitions for review of an order of the Board of Immigration Appeals ("BIA") dismissing his appeal of a decision of an Immigration Judge ("IJ") that denied his application for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). On appeal, Ruvira Guerra argues that the record compels a conclusion that he is eligible for CAT relief and that the BIA failed to give his case reasoned consideration. After careful review, we deny Ruvira Guerra's petition.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Ruvira Guerra, a native citizen of Cuba, was admitted to the United States in May 1980 after coming to the United States as part of the Mariel boatlift.[1] In 1987, he became a lawful permanent resident, and the adjudgment was dated back to 1980. In 2012, he was convicted of two counts of conspiracy to distribute five kilograms or more of cocaine. Later, the Department of Homeland Security ("DHS") served Ruvira Guerra with a notice to appear alleging that he was removable under the Immigration and Nationality Act ("INA") for having been convicted of: (i) two crimes involving

---

[1] For background on the Mariel boatlift and some of its effects on federal law, see *United States v. Zayas-Morales*, 685 F.2d 1272, 1273–78 (11th Cir. 1982), and *United States v. Dominguez*, 661 F.3d 1051, 1075–1105 (11th Cir. 2011) (Tjoflat, J., concurring in part and dissenting in part).

moral turpitude, INA § 237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii); (ii) a crime related to a controlled substance, INA § 237(a)(2)(B)(i), 8 U.S.C. § 1227(a)(2)(B)(i); and (iii) a drug trafficking crime that constituted an "aggravated felony" as defined in the INA, INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii). *See also* INA § 101(a)(43), 8 U.S.C. § 1101(a)(43) (defining aggravated felony). With counsel present, Ruvira Guerra appeared before an IJ and conceded that he was removable as charged.

Ruvira Guerra applied for asylum, withholding of removal, and CAT relief in March 2017. In his application, he stated that he was seeking protection based on his political opinion, his membership in a particular social group, and under the CAT. He later conceded he was ineligible for all relief except deferral of removal under the CAT.

Ruvira Guerra's application explained that he had been arrested and tortured in Cuba when he was 15 years old due to his anti-revolutionary beliefs and actions. He tried to flee Cuba, but the Cuban border patrol arrested him. After his arrest, he was interrogated, and officers "cracked" his head, told him that his parents had been jailed, and demanded information about anti-Castro regime flyers that he had been distributing. He faced a one-day trial where he was found guilty of being an anti-revolutionary and was sentenced to 25 years' imprisonment. While imprisoned, officials beat and tortured Ruvira Guerra, and he suffered injuries such as broken fingers and head trauma. During that time, officials deprived him of medical treatment, food, and water for prolonged

periods of time.  After almost a year in prison, Ruvira Guerra was transferred to a government re-education center where he continued to face abuse.  Even so, he was ultimately released after 18 months, under a law prohibiting the incarceration of minors.  After his incarceration, Ruvira Guerra was afraid to return to school because of his political beliefs and struggled to find work because he had been labeled an anti-revolutionary.  He eventually found work and remained in Cuba until May 1980, when he fled to the United States.

Ruvira Guerra feared returning to Cuba because of the torture he had faced there as a former political prisoner.  He explained that he had distributed anti-Castro and anti-communist flyers and had attempted to flee the country, leading to his arrest.  He was also accused of being an anti-revolutionary traitor because his father and uncles were in the government under Fulgencio Batista and because he had attempted to flee Cuba.  After Castro came into power, his father and uncles had been stripped of military rank, jailed, and tortured.  Their lives were ultimately saved because there were no "records of their anti-revolutionary acts."  In a sworn declaration, Ruvira Guerra also alleged that his father had been sent to Mexico by the former Cuban regime to assassinate Fidel Castro but had been unsuccessful.  Before leaving Cuba, Ruvira Guerra learned that, during the Mariel boatlift period, the Cuban government had been looking to reimprison him, because someone Ruvira Guerra knew, a member of the state security apparatus, had told him that he was being followed.  His declaration also highlighted his cooperation with the government during his criminal

case.[2] He submitted evidence in addition to his declaration, including country conditions evidence.

The country conditions evidence stated that Cuba was an authoritarian state controlled by the Communist party and explained that there were "reports of an unlawful and arbitrary killing by police; torture of political dissidents, detainees, and prisoners by security forces; harsh and life-threatening prison conditions; arbitrary arrest and detention; holding of political prisoners," and that "[i]mpunity for the perpetrators" of human rights abuses "remained widespread." Moreover, the evidence reflected that there are restrictions on—and even violent responses to—free expression, assembly, and political activity in opposition to the government and retribution, including harassment and job loss, for those who opposed the government or departed (or attempted to depart) the country. The evidence also showed that there was significant interference with privacy in the country, including the use of surveillance, informants, and neighborhood committees, designed to monitor opponents of the government, as well as restrictions on freedom of movement. The evidence showed that the government "continued to hold political prisoners," but that the exact number was unclear—"the CCDHRN established there were 120 political prisoners, while other credible groups put the number

---

[2] At another point in his application, Ruvira Guerra stated that he feared retribution for assisting in the prosecution of various others who have family in Cuba, but he does not press this issue on appeal, so we conclude it is abandoned. *See Alkotof v. U.S. Att'y Gen.*, 106 F.4th 1289, 1295 n.9 (11th Cir. 2024).

slightly higher." Even so, "short-term arbitrary arrests" were more common, with more than 3,700 reported arrests between January and August 2017. The government uses arrests to "harass and intimidate critics, independent activists, political opponents, and others."

An IJ held an individual hearing on Ruvira Guerra's application. At the beginning of the hearing, the parties submitted the documentary evidence summarized above, without objection. The IJ explained that the documents submitted were relevant, but that it would only "give any material weight to documents that [were] specifically referenced by page and part during [the] hearing . . . because there's a difference between what is relevant and what is material." Neither party objected to the IJ's evidentiary procedure.

Ruvira Guerra then testified, and his testimony was largely consistent with his written application. He explained that he was born in Cuba in 1952 and remained a Cuban citizen. He testified that he has four children, all of whom are American citizens, and worked as a chauffeur until he stopped working because of disability. He recounted that, when he was 15, he went to jail for "conspir[ing] against the Cuban government" by distributing flyers and attempting to leave the country. He then recounted that, he tried to flee Cuba and boarded a boat to the United States but was captured by the Cuban Coast Guard and imprisoned. He explained that he had tried to leave because he did not "like communism" and because his family was in the military before Castro came to

power.  He testified that his father had been imprisoned, beaten, "treated . . . like a dog," and "tortured" for his military service.  Further, he stated, even after his release from prison, people would throw stones at his family's house, and his other family members who had been in the military suffered similar treatment.

After a one-day trial, Ruvira Guerra was sentenced to 25 years in jail and served 18 months in prison.  In prison, he was not allowed visitors, and he was tortured.  He was repeatedly interrogated and told that his parents were in jail and was hit in the head with "the butt of a gun."  On other occasions, he was hit with a stick.  Authorities also broke his hand, leaving a wound that remained visible at the time of the hearing.  He received some medical care—stitches—but they did not treat his pain with medication.  He was ultimately transferred between three jails.  The conditions were poor; at one point he was kept in a small cell with eight men, and none of them were permitted to leave the cell at any point of the day or night.  He was given very little food.  The third prison was a re-education camp, and people from the government "would come all the time and . . . say that the government was good" in one-on-one discussions with prisoners.

Ultimately, Ruvira Guerra was released because a law was passed "saying that there couldn't be so many young men in jail who were counter-revolutionaries."  He returned home but never went back to school.  He was also excluded from obligatory military service because he had been a political prisoner.  He became a mechanic assistant, but life remained difficult for him and his

family.  Government supporters threw stones at his family's home and "sa[id] things" negatively about him.  Little by little, his family started coming to the United States.  When he departed Cuba in 1980 as part of the Mariel boatlift, he was no longer engaged in counter-revolutionary activities, but the government still wanted to put him in jail as a counter-revolutionary because, according to Ruvira Guerra, "once you have a problem, you're marked."  Ruvira Guerra explained that he feared returning to Cuba because he could be put back into jail and the government could do "what they did before."  He explained that the government would "finish" him because he opposes the Cuban government and communism and because his family was in the military under the prior regime.

On cross-examination, Ruvira Guerra explained that his father had been imprisoned for his service in the military, but that the records were ultimately destroyed—leading to his father's release.  He also explained that his parents had given him the money he used to build the boat he had attempted to flee Cuba on when he was 15.  He also conceded that his wife's cousins visit Cuba and return to the United States, which he acknowledged was impossible for many years.  Still, he explained, he had never returned to Cuba.  He acknowledged that he remained in Cuba from the time he was 16 or 17 (when he was released from prison) until he was 28 (when he fled as part of the Mariel boatlift) without being reincarcerated.  He also conceded that he was not tortured during that period, even though he faced mistreatment.  Finally, he conceded that the Cuban government permitted him to leave in 1980.

In closing arguments, Ruvira Guerra explained that he "provided some country reports concerning Cuba and the conditions in Cuba for the general population as well as political prisoners as well." He noted that he was a former political prisoner who had been tortured and that the Cuban government was still looking for him at the time he left the country. He noted that he provided information regarding his family's military service in Cuba before the revolution. Based on the record, he requested that the IJ grant CAT relief. The government argued that Ruvira Guerra was not credible and highlighted the fact that he had lived in Cuba without being tortured from the age of 16 until he left the country.

The IJ issued an oral decision. The IJ first noted that it had "considered all of" the record "evidence in its entirety[,] whether or not specifically mentioned in th[e] decision[,] and afforded such evidence the appropriate weight . . . ." Yet it reiterated that it "would not provide any evidentiary weight to documents not specifically referenced by page and part during the hearing" and reminded the parties that no one had objected to that procedure. After summarizing the testimony, the IJ concluded that Ruvira Guerra was a credible witness, at least "as to his own subjective understanding of the experiences and information to which he testified." Still, having considered the CAT regulations, *see* 8 C.F.R. § 1208.16(c)(3), the IJ concluded that Ruvira Guerra had not shown it was more likely than not he would be tortured if removed to Cuba.

The IJ acknowledged that "there c[ould] be little dispute" that Ruvira Guerra "was tortured by the Castro regime when he was beaten, imprisoned in poor conditions, repeatedly interrogated, held at a reeducation camp, [and] deprived of access to his family or counsel." All the same, the IJ noted that, "[d]espite th[at] atrocious treatment," Ruvira Guerra remained in Cuba without imprisonment from when he was 17 until he was 28, nearly 40 years had passed since that time, and some of his family had returned to Cuba without incident. Therefore, the IJ held there was "simply no clear record evidence to demonstrate that respondent would be targeted by the current Cuban government due to his actions in trying to leave Cuba when he was 15 years old." The IJ remarked that it was denying the application "with a heavy heart." It also explained that "while the country conditions evidence demonstrate[d] some continuing violations of human rights in Cuba," they did "not provide evidence for those similarly situated to" Ruvira Guerra. Thus, the IJ denied Ruvira Guerra's applications and ordered him removed to Cuba.[3]

Ruvira Guerra administratively appealed the IJ's decision, arguing that he was eligible for deferral of removal under the CAT. He highlighted his testimony during the hearing and noted that he had been put in jail and tortured in the past. He also noted that Cuba has serious human rights issues, which, together with his past

---

[3] The IJ also "impress[ed] upon DHS" that it believed Ruvira Guerra's case was one "to consider for [a] form of discretion" because of Ruvira Guerra's "advanced age."

torture, made torture in the future likely. He also reiterated that the country conditions evidence showed arbitrary detention and horrific conditions. He argued that his 30 years in the United States would place him under the suspicion of the Cuban government given his previous activities.

A single member of the BIA dismissed Ruvira Guerra's administrative appeal in November 2023. It explained that it would review questions of fact under the clearly erroneous standard, 8 C.F.R. § 1003.1(d)(3)(i), and all other issues *de novo*, *id.* § 1003.1(d)(3)(ii).[4] Regarding Ruvira Guerra's request for deferral of removal under the CAT, the BIA "adopt[ed] and affirm[ed] the [IJ]'s decision," concluding that the factual findings were not clearly erroneous, and that Ruvira Guerra's arguments were not persuasive. Accordingly, the BIA dismissed the administrative appeal. Ruvira Guerra timely petitioned for review. *See* 8 U.S.C. § 1252(b)(1).

## II. STANDARDS OF REVIEW

We review legal issues *de novo*. *Zheng v. U.S. Att'y Gen.*, 451 F.3d 1287, 1289 (11th Cir. 2006). "We review the BIA's decision as the final judgment, unless the BIA expressly adopted the IJ's

---

[4] The BIA concluded that Ruvira Guerra had "waived" any argument that the IJ erred in finding: (i) that he was removable; or (ii) that he was convicted of a particularly serious crime that rendered him ineligible for asylum, withholding of removal under the INA, and withholding of removal under the CAT. Ruvira Guerra does not challenge these conclusions before us, so any issue in this respect is abandoned. *See Alkotof*, 106 F.4th at 1295 n.9.

decision." *Gonzalez v. U.S. Att'y. Gen.*, 820 F.3d 399, 403 (11th Cir. 2016), *abrogated in part on other grounds by Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). When the BIA agrees with the IJ's reasoning, we will also review the IJ's decision to that extent. *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009). In deciding whether to uphold the BIA's decision, we are limited to the grounds upon which the BIA relied. *Gonzalez*, 820 F.3d at 403.

We review the BIA's factual determinations under the substantial evidence standard. *Kazemzadeh*, 577 F.3d at 1351. In reviewing for substantial evidence, we will affirm the BIA's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026–27 (11th Cir. 2004) (*en banc*) (quoting *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1283–84 (11th Cir. 2001), *overruled in part on other grounds by Santos-Zacaria v. Garland,* 598 U.S. 411, 419-23 & n.2 (2023)).[5] We "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Id.* at 1029. The substantial evidence "standard is high: we will not reverse a finding of fact unless the record compels reversal." *Laguna Rivera v. U.S. Att'y Gen.*, 130 F.4th 915, 919 (11th Cir. 2025) (citing *Adefemi*, 386 F.3d at 1026–27).

---

[5] In 2023, the Supreme Court held that the obligation to exhaust administrative remedies in 8 U.S.C. § 1252(d)(1) is a claims-processing rule, not a jurisdictional limitation, and is subject to waiver and forfeiture, overturning our prior precedent to the contrary. *Santos-Zacaria*, 598 U.S. at 419-23 & n.2.

## III. DISCUSSION

Ruvira Guerra argues that, considering all relevant evidence, he has established that it is more likely than not that he would be tortured if he is removed to Cuba, and thus, we are compelled to reverse the agency's denial of deferral of removal under CAT. He urges us to review both the BIA's and the IJ's decisions. The whole record, he contends, shows that he experienced torture before, and the Cuban government will imprison him and torture him again if he is returned. He explains that he has not changed his political beliefs and continues to oppose the Cuban government—which was the reason he was tortured. He notes that the IJ found him credible and that credible testimony, alone, can be sufficient to prove eligibility under the CAT. He contends that he was not required to show that relocation within Cuba would be "impossible" and that the IJ failed to give reasoned consideration to the evidence he presented on that point. He also argues that the IJ's statement that it would not "give any material weight to documents that were not specifically referenced by page and part" showed that the IJ failed to consider all the evidence. Viewing the whole record, he maintains, shows that he would face future torture if returned and could not avoid torture by relocating. He also claims the IJ failed to give reasoned consideration to the evidence presented about Cuba, including that there was gross, flagrant, or mass violations of human rights throughout the country. Properly viewed, he argues, the record shows that there remains torture of political dissidents like himself in Cuba.

Ruvira Guerra also asserts that the IJ incorrectly found that he lived without imprisonment or harm from the time he was 17 to 28 years old because he had testified that, during that time, he experienced mistreatment, insults, government surveillance, and denial of access to education and employment; stones were thrown at his house; he was treated poorly and insulted; and he was followed by government agents. He maintains the IJ put too much weight on the fact that some of his wife's family members have returned to Cuba without incident; especially because there is no evidence about whether those family members shared his political opinions. He argues that the IJ failed to consider the reason for his persecution in the first place: his family's counter-revolutionary actions, including his own attempt to flee the country which led to his own imprisonment and torture. Finally, he states that the same party and ideology are in power in Cuba as at the time when he was tortured, and "the repression against government opposers continues."

The government argues that we should deny the petition. It concedes that Ruvira Guerra "suffered appalling torture during his time in Cuba." Still, it argues that there is not sufficient evidence Ruvira Guerra will suffer torture in the future. It asserts "the passage of time, changes of national leadership, and even new attitudes" all counsel against a finding that Ruvira Guerra would be tortured again. Moreover, it notes, Ruvira Guerra had lived for over a decade in Cuba without being tortured. It contends that, while some facts weighed in favor of the application, the IJ's

decision reflected careful consideration of the record and was within the realm of acceptable decisions.

The BIA must give reasoned consideration to the issues presented to it, meaning that its decision must show that it has "considered the issues raised and announced its decision in terms sufficient to enable a reviewing court to know that it has heard and thought and not merely reacted." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 803 (11th Cir. 2016) (alterations adopted) (quoting *Seck v. U.S. Att'y Gen.*, 663 F.3d 1356, 1364 (11th Cir. 2011)), *overruled in part on other grounds by Santos-Zacaria*, 598 U.S. at 419-23 & n.2. We have found the BIA's analysis was enough to show reasoned consideration when it listed the basic facts of the case, referred to relevant statutory and regulatory authority, and accepted several grounds on which the IJ denied the petitioner's request for relief. *Bing Quan Lin v. U.S. Att'y Gen.*, 881 F.3d 860, 874–75 (11th Cir. 2018), *overruled in part on other grounds by Santos-Zacaria*, 598 U.S. at 419–23 & n.2. On the other hand, the BIA fails to give reasoned consideration to a claim when it "misstates the contents of the record, fails to adequately explain its rejection of logical conclusions, or provides justifications for its decision which are unreasonable and which do not respond to any arguments in the record." *Id.* at 874. A reasoned consideration inquiry is a question of law. *Jeune*, 810 F.3d at 799.

"To establish eligibility for CAT relief, an applicant must show that it is more likely than not that [s]he will be tortured by, or with the acquiescence of, government officials if returned to the designated country of removal." *Todorovic v. U.S. Att'y Gen.*,

621 F.3d 1318, 1324 (11th Cir. 2010); *Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1293 (11th Cir. 2020); *see also* 8 C.F.R. §§ 1208.16(c)(2), 1208.17(a). "Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 208.18(a)(2); *see also id.* § 208.18(a)(1). "[T]o constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." *Id.* § 208.18(a)(5). "An act that results in unanticipated or unintended severity of pain and suffering" does not qualify as torture. *Id.* "[T]o constitute 'torture' under the CAT, the harm the petitioner alleges must be 'inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1241 (11th Cir. 2004) (quoting 8 C.F.R. § 208.18(a)(1)).

In assessing an applicant's eligibility for CAT protection, we consider all evidence "relevant to the possibility of future torture," which includes "(1) whether the applicant has experienced past torture; (2) whether he could avoid future torture by relocating within the country; and (3) evidence about wider country conditions, including whether there have been gross, flagrant or mass violations of human rights in the country." *K.Y. v. U.S. Att'y Gen.*, 43 F.4th 1175, 1181 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 2506 (2023) (mem.), *overruled in part on other grounds by Santos-Zacaria*, 598 U.S. at 419–23 & n.2; *see also* 8 C.F.R. § 208.16(c)(3). While all relevant evidence is to be considered, "[t]he evidence must demonstrate that the applicant will be *specifically and individually* targeted for

torture." *K.Y.*, 43 F.4th at 1181 (emphasis in original); *see also In re J-E*, 23 I. & N. Dec. 291, 300–01 (BIA 2002) (*en banc*) (describing the "specific intent" requirement for torture under the CAT). The burden to show an individualized risk of torture means that "evidence of generalized mistreatment and some isolated instances of torture" is insufficient on its own to qualify for CAT protection. *Jean-Pierre v. U.S. Att'y Gen.*, 500 F.3d 1315, 1324 (11th Cir. 2007).

"It's not always the case that credibility equals factual accuracy, nor does it guarantee a legal victory." *Garland v. Ming Dai*, 593 U.S. 357, 372 (2021). To this end, "the agency may weigh . . . 'credible testimony along with other evidence of record.'" *Id.* at 371 (quoting INA § 208(b)(1)(B)(ii), 8 U.S.C. § 1158(b)(1)(B)(ii)). "[E]ven credible testimony may be outweighed by other more persuasive evidence or be insufficient to satisfy the burden of proof." *Id.* at 373. "The only question for judges reviewing the [agency's] factual determinations is whether *any* reasonable adjudicator could have found as the agency did." *Id.* at 368 (emphasis in original).

Here, the BIA adopted and affirmed the IJ's decision, so we review both decisions as the agency's final decision. *Jeune*, 810 F.3d at 799.[6] Having reviewed the decisions, we conclude the agency gave reasoned consideration to Ruvira Guerra's arguments.

---

[6] In passing, the government suggests that Ruvira Guerra has raised new arguments before us, but it does not fully flesh out this issue. Section 1252(d)(1) of the INA provides that a court can review a final order of removal only if the noncitizen "has exhausted all administrative remedies available to the

While Ruvira Guerra asserts that the agency failed to give reasoned consideration to whether he could avoid torture by relocating within Cuba, the IJ concluded that Ruvira Guerra had not made a threshold showing that he would likely be tortured anywhere in Cuba.  Because the IJ determined Ruvira Guerra had not shown he would face torture anywhere, the IJ was not required to analyze whether he could relocate, *i.e.,* whether there were areas more or less dangerous for him in Cuba.  *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (explaining that generally, "courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach"); *Farah v. U.S. Att'y Gen.*, 12 F.4th 1312, 1326 (11th Cir. 2021) (same), *overruled in part on other grounds by Santos-Zacaria*, 598 U.S. at 419-23 & n.2.

Despite the IJ's statement that it had considered all the evidence the parties submitted, regardless of whether it was

---

[noncitizen] as of right."  INA § 242(d)(1), 8 U.S.C. § 1252(d)(1).  However, exhaustion is "not a stringent requirement," *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1297 (11th Cir. 2015), *overruled in part on other grounds by Santos-Zacaria*, 598 U.S. at 419–23 & n.2, and the exhaustion requirement is a claims-processing rule, so we generally apply it only when it has been asserted by a party, *Kemokai v. U.S. Att'y Gen.*, 83 F.4th 886, 891 (11th Cir. 2023).  The government's brief does not plainly and prominently raise the issue of exhaustion (nor use the term), so we consider the issue forfeited.  *See Singh v. U.S. Att'y Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009) ("[S]imply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue . . . .").  In any event, we rarely find reasoned consideration claims unexhausted because to hold such a claim unexhausted would "fault" a petitioner "for raising an argument about the lack of reasoned consideration displayed by a [BIA] decision not yet in existence."  *Indrawati*, 779 F.3d at 1299.

referenced in its decision, Ruvira Guerra also argues the IJ's evidentiary procedures reflect a lack of reasoned consideration. Having reviewed the IJ and BIA decisions, along with the record, the agency's discussion of the evidence was sufficient such that we can undertake meaningful appellate review, so Ruvira Guerra's reasoned consideration argument about the IJ's evidentiary procedure also fails. *Indrawati*, 779 F.3d at 1302.[7] At bottom, we are satisfied that the agency "consider[ed] the issues raised and announced its decision in terms sufficient to enable [us] to know that it has heard and thought and not merely reacted." *Jeune*, 810 F.3d at 803. Therefore, we proceed to the merits.

Our review of the agency's factfinding is deferential, and we conclude that substantial evidence supports the agency's decision. We address two of the three categories of evidence our precedent has typically looked to and explain why the agency reasonably concluded that Ruvira Guerra failed to satisfy his burden. *K.Y.*,

---

[7] Ruvira Guerra has not raised a due process challenge to the IJ's evidentiary procedure, so we do not address any issue in that respect here. Accordingly, we do not hold that the IJ's evidentiary procedure—which gave material weight only to evidence cited by page and part—was optimal or complied with due process. Indeed, generally the agency must consider all the evidence submitted by a petitioner. *See Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006). We simply conclude that, on this record, the IJ's procedure did not create a reasoned consideration problem—the record does not show that the agency failed to "consider the issues raised." *Jeune*, 810 F.3d at 803. As a final note, Ruvira Guerra had an opportunity to identify any potential evidentiary errors in the IJ's ruling in his administrative appeal and, to the extent that a different evidentiary procedure would have been better, neither party objected nor suggested one to the IJ.

43 F.4th at 1181.  As explained above, the agency did not need to resolve the second category we have looked to—"whether he could avoid future torture by relocating within the country," *id.* — because it concluded he had not established he would suffer torture anywhere, *Bagamasbad*, 429 U.S. at 25.

First, the IJ concluded that Ruvira Guerra underwent past torture in Cuba when he was 15.  *See K.Y.*, 43 F.4th at 1181 (considering "whether the applicant has experienced past torture").  The record supports the IJ's conclusion on this issue and the government no longer challenges Ruvira Guerra's credibility—so we conclude that finding of past torture is supported by substantial evidence.  *See Adefemi*, 386 F.3d at 1026–27.  Still, a finding of past torture, while relevant, does not necessarily mean that an applicant has shown that it is more likely than not that they will be tortured in the future, if removed.  *See K.Y.*, 43 F.4th at 1181; *Ming Dai*, 593 U.S. at 373 (explaining that "even credible testimony may . . . be insufficient to satisfy the burden of proof").

We understand the IJ to have given Ruvira Guerra's past torture less weight because of several other facts in the record, and we conclude it was not unreasonable to do so.  The IJ found, and Ruvira Guerra conceded at least in part, that he lived without government interference in Cuba—and "without imprisonment or harm"—for ten years, from when he was released from imprisonment until he left the country.  Many years have passed since Ruvira Guerra was last in Cuba and no evidence in the record suggests that the Cuban government will still perceive him the same way it

perceived him in the 1960s and 1970s. *See, e.g.*, *Eritsian v. Att'y Gen.*, 845 F. App'x 826, 839 (11th Cir. 2021) (unpublished) (noting, as facts supporting the agency's decision, that the petitioner's "last known incident of harm in Azerbaijan was in 1990—almost three decades ago" and that the petitioner "ha[d] not resided in Azerbaijan since 1994"); *Ruiz-Colmenares v. Garland*, 25 F.4th 742, 751 (9th Cir. 2022) ("Petitioner hasn't received a single threat while in the United States and, combined with the twenty-year distance between his last incident and the present day, there is no evidence that he currently faces any particularized risk of harm.").

Further, as the IJ found, some members of Ruvira Guerra's extended family have returned to Cuba (and traveled between Cuba and the United States) without issue, suggesting some differences from the 1960s and 1970s. After the IJ relied on his family members' travel, Ruvira Guerra did not submit evidence in his administrative appeal to support his argument before us that there were material differences between himself and those family members. As noted above, the burden to establish eligibility for CAT relief fell on him, the applicant, and we must draw reasonable inferences in favor of the IJ's decision. *Adefemi*, 386 F.3d at 1029; *Todorovic*, 621 F.3d at 1324.

The IJ also recognized that Ruvira Guerra's ten years in Cuba post-imprisonment were not easy and discussed how Ruvira Guerra's testimony showed that he still faced a "difficult life" because of his political ideology. This mistreatment, while contemptible, does not establish that he will face torture, rather than

mistreatment, on his return to Cuba, as torture "does not include lesser forms of cruel, inhuman or degrading treatment or punishment . . . ." 8 C.F.R. § 208.18(a)(2); *see, e.g.*, *Cadet v. Bulger*, 377 F.3d 1173, 1195 (11th Cir. 2004) (applying deference to the BIA's definition of torture and concluding that some "forms of police brutality in Haiti—beatings with fists, sticks, and belts—did not rise to the level of severity necessary to constitute CAT-prohibited torture"), *abrogated in part by Loper Bright*, 603 U.S. at 412-13; *see also K.Y.*, 43 F.4th at 1182 ("Extortion or discrimination are not the same as torture."). Moreover, some of the mistreatment he described in his testimony, such as the stones being thrown at his family's house, was not alleged to have been done either by the government or with the acquiescence of the government, so it does not constitute torture under the CAT for that additional reason. *Reyes-Sanchez*, 369 F.3d at 1241. For all these reasons, we conclude that the record does not compel a different weighing of Ruvira Guerra's past torture, even if another fair adjudicator might have given it more weight. *See Laguna Rivera*, 130 F.4th at 919.

Second, while Ruvira Guerra submitted various country evidence in support of his application, *see K.Y.*, 43 F.4th at 1181 (looking to "evidence about wider country conditions, including whether there have been gross, flagrant or mass violations of human rights in the country"), the evidence did not tie the Cuban government's misconduct to any facts showing that he—or others similar to him—will be targeted individually for torture. The IJ recognized that there were "some continuing violations of human rights in Cuba," but reasoned that Ruvira Guerra had not shown

that he would be a target for that treatment.  The IJ's view of the record is supported.  While there is evidence in the record about torture and human rights violations in Cuba, Ruvira Guerra did not present any evidence showing that the Cuban government today would still perceive him as a political enemy for his conduct 50 or 60 years ago.  *See Laguna Rivera*, 130 F.4th at 919.  Without that tie, the evidence of Cuba's country conditions does not strongly assist Ruvira Guerra in proving that *he* "will be *specifically and individually* targeted for torture."  *K.Y.*, 43 F.4th at 1181 (emphasis in original); *see also Jean-Pierre*, 500 F.3d at 1324.

## IV. CONCLUSION

"The only question for judges reviewing the [agency's] factual determinations is whether *any* reasonable adjudicator could have found as the agency did."  *Ming Dai*, 593 U.S. at 368 (emphasis in original).  In light of that standard, Ruvira Guerra has not established that the agency's determination—that he had not shown he is more likely than not to face torture if returned to Cuba—is unsupported by substantial evidence.  *Todorovic*, 621 F.3d at 1324; *Lingeswaran*, 969 F.3d at 1293.  Ruvira Guerra has also not shown that the agency failed to give his case reasoned consideration.  Accordingly, we deny the petition for review.

**PETITION DENIED.**